IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 753 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated June 23, |
| | : | 2017 in the Court of Common Pleas, |
| | : | Dauphin County, Criminal Division at |
| v. | : | No. CP-22-CR-0001773-2000. |
| | : | |
| | : | SUBMITTED:  May 14, 2018 |
| HERBERT BLAKENEY, | : | |
| | : | |
| Appellant | : | |

> Justice Wecht announces the judgment of the Court with respect to Parts III and IV, in which Justice Donohue joins, and in which Justices Dougherty and Mundy concur in the result.  Justice Wecht delivers an opinion in support of reversal with respect to Parts I and II, in which Justice Donohue joins.  As to Parts I and II, Justices Dougherty and Mundy file separate opinions in support of affirmance.

## OPINION

**JUSTICE WECHT**                                      **DECIDED:  September 21, 2018**

Herbert Blakeney appeals from the dismissal of a facially untimely, second petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1]  Recognizing that his petition is untimely, Blakeney relies, *inter alia*, upon the exception to the one-year time-bar for newly discovered facts.[2]  We affirm the PCRA court's orders denying Blakeney's requests for disqualification of the Dauphin County District Attorney's Office and recusal of the

---

[1]     *See* 42 Pa.C.S. §§ 9541-46.

[2]     *See* 42 Pa.C.S. § 9545(b)(1)(ii).

PCRA court. With respect to whether Blakeney has established that the facts upon which his claim is predicated were unknown to him and could not have been ascertained by the exercise of due diligence, this Court is equally divided. Accordingly, inasmuch as the Court is equally divided, the PCRA court's determination of untimeliness is affirmed.[3]

## I.    Background

We detailed the facts underlying Blakeney's convictions in our opinion on direct appeal, *Commonwealth v. Blakeney* ("*Blakeney I*"), 946 A.2d 645 (Pa. 2008), and in our opinion following Blakeney's appeal from the denial of his first PCRA petition, *Commonwealth v. Blakeney* ("*Blakeney II*"), 108 A.3d 739 (Pa. 2014). For purposes of today's proceeding, a brief summary will suffice.

Blakeney's estranged wife, Sacha Blakeney ("Sacha"), lived in an apartment with her friend Duana Swanson ("Swanson") and their respective children. One of Sacha's children, Basil, was fourteen months old (and not fathered by Blakeney). On February 1, 2000, Harrisburg police responded to a report of a domestic disturbance at the apartment, and officers escorted Blakeney from the scene. Afraid that Blakeney would return, Swanson asked the police "to keep an eye on the place." *Blakeney I*, 946 A.2d at 649.

In the early morning hours of February 2, 2000, Blakeney reentered the apartment. He carried a butcher knife. At that time, Sacha was not home. Blakeney confronted Swanson and the children in a bedroom. Blakeney grabbed Swanson by the arm as Swanson's son, Maurice, ran from the room. Maurice encountered Harrisburg Police Officer William Vernouski, who had heard Swanson screaming, standing on the threshold of the apartment door with his gun drawn. Officer Vernouski entered the apartment to

---

[3]    *See Creamer v. Twelve Common Pleas Judges*, 281 A.2d 57, 58 (Pa. 1971) ("The principle is well established in this Commonwealth as well as many other jurisdictions that, when an appellate court is equally divided, the judgment, order or decree of the court below will be affirmed.").

find Blakeney stabbing Swanson repeatedly in the chest with the butcher knife. Blakeney continued to stab Swanson despite Officer Vernouski's repeated commands to drop the knife. Instead of complying, Blakeney strangled Swanson until she lost consciousness. When Swanson became unconscious, Blakeney grabbed Basil, clasping the child with his left arm while holding the knife in his right hand with the blade to Basil's throat. Officer Vernouski, who by that time had been joined by other officers, attempted to reason with Blakeney, who refused to put Basil down. Instead, Blakeney cut Basil's throat with the butcher knife in a sawing motion, causing the child's death. Blakeney relinquished control of Basil's body only after Officer Vernouski shot Blakeney three times. Blakeney survived, and was charged with murder.[4]

In 2002, Blakeney proceeded to a jury trial in the Dauphin County Court of Common Pleas, with the Honorable John F. Cherry presiding. Blakeney chose to represent himself during trial, at both the "guilt" and "penalty" phases. Then-District Attorney Edward Marsico represented the Commonwealth at trial and on direct appeal.[5] While representing himself, Blakeney, who is African-American and Muslim, made repeated references to his religion. For example, in his opening statement to the jury, Blakeney declared: "I don't want to cause nobody no problems. My job is clear. I am a Muslim . . . . This is a sign to my people, the Muslims. How you judge me today in front of them, that America has justice in their hearts still. Trust me. They will hear about this

---

[4] Blakeney also was charged with (and later convicted of) attempted murder and aggravated assault as to Swanson, who survived the attack.

[5] The Honorable Edward Marsico has since been elected to, and commissioned a Judge of, the Court of Common Pleas of Dauphin County.

case." Notes of Testimony (N.T.), volume 2, 491-92.[6]  On August 8, 2002, the jury found Blakeney guilty of first-degree murder.

During the penalty phase, Blakeney declined to present any mitigating evidence, explaining to the court that he made this decision because "[t]his is a religious thing." N.T. 8/1/2002, volume 2, 925.  The Commonwealth introduced evidence to support three aggravating circumstances, and the jury recommended a sentence of death.  On October 17, 2002, Judge Cherry formally sentenced Blakeney to death.  This Court affirmed. *Blakeney I*, 946 A.2d at 649.  On February 23, 2009, the Supreme Court of the United States denied *certiorari*.  *Blakeney v. Pennsylvania*, 555 U.S. 1177 (2009).

In March 2009, Blakeney filed a timely, *pro se* PCRA petition.  On December 21, 2010, Blakeney timely filed a counseled PCRA petition.  The PCRA court denied relief without a hearing.  This Court affirmed.  *Blakeney II*, 108 A.3d at 739.  Then-First Assistant District Attorney (now District Attorney) Francis Chardo represented the Commonwealth in post-conviction proceedings, and presently is counsel of record for the Commonwealth in Blakeney's ongoing federal *habeas corpus* proceedings.

On October 8, 2015, the *Philadelphia Inquirer* reported that media outlets had obtained a number of emails sent by and/or received from then-Justice Michael Eakin through a private email account that Justice Eakin established under the pseudonym "John Smith."[7]  The following day, the *Reading Eagle* (in a reprint of an *Inquirer* report) further described the emails.  The *Inquirer* and the *Eagle* detailed the offensive content in

---

[6]  The Notes of Testimony from Blakeney's trial span two volumes, each of which includes multiple days.  For ease of reference, we cite to the volume and page number rather than the date of the testimony.

[7]  Justice Eakin resigned from this Court on March 15, 2016.  Barbara Goldberg, *Second Pennsylvania Judge Resigns amid 'Porngate' Scandal*, REUTERS, March 15, 2016, https://www.reuters.com/article/us-pennsylvania-kane/second-pennsylvania-judge-resigns-amid-porngate-scandal-idUSKCN0WH2MR (last viewed July 11, 2018).

these emails, sent or received by Justice Eakin, many of which referenced race, gender, religion, ethnicity, or class. The articles linked Justice Eakin's emails to unnamed members of the Dauphin County Court of Common Pleas and the Dauphin County District Attorney's Office. These emails had been in the possession of the Office of the Attorney General ("OAG"), which obtained them when they were sent to the official email addresses of persons employed by the OAG. The Inquirer began its account as follows: "Scroll through state Supreme Court Justice J. Michael Eakin's private inbox and it seems as if everyone is in on the joke: judges, state prosecutors, assistant U.S. attorneys, public defenders, private lawyers. Everyone, of course, except the defendants or victims who could wind up in their courtrooms or offices." The *Inquirer* and the *Eagle* described the emails as including:

> An email sent by Justice Eakin containing a "joke" about a woman complaining to a doctor that her husband "beats me to a pulp," to which the doctor recommends that she "swish tea in her mouth" and not "swallow" until her husband is asleep, concluding: "You see how much keeping your mouth shut helps?"

> An email sent by Justice Eakin containing the reference "Why I failed 4th Grade" with a photo of a teacher asking the student for two examples of an abstract noun and the student responding "your t--s."

> An email sent to Justice Eakin attaching a video called "Craziest white man ever" featuring a man picking up immigrant day workers (referred to as "beaners" and "animals") [ ]under the ruse that he needs help with his deck, then turning them in to U.S. immigration officials, then laughing hysterically as they scatter from his pickup truck and saying: "That's what I do every couple of weeks just to get rid of - ya know, thin out the herd a little bit," . . . "Make sure they don't overpopulate."

> An email sent to Justice Eakin containing a "joke" in which a mother laments that Muslim children "blow up so fast, don't they?"

> An email sent in 2011, after [Jerry] Sandusky was arrested for sexually abusing minors, containing an image of Macaulay Culkin from "Home Alone," replacing the burglar behind him with a smiling [Jerry] Sandusky.

An email with a video in which a black woman complains that President Barack Obama wants to create jobs. "You mean I'm not going to get my government check?" the woman asks.

Petition for Writ of *Habeas Corpus* and for Collateral Relief ("Petition"), 11/30/2015, at 16-17 (citing William Bender, *A Supreme Court Justice's Indecent Inbox*, THE PHILADELPHIA INQUIRER, Oct. 8, 2015; Craig R. McCoy and Angela Couloumbis, *Pa. Supreme Court Justice Reportedly Involved in Racist Email Exchanges*, THE READING EAGLE, Oct. 9, 2015).[8]

An October 30, 2015 report by the Special Counsel to this Court further described the emails. In particular, the Special Counsel noted that Justice Eakin sent or forwarded many emails that were "insensitive, chauvinistic and offensive to women," including the first two emails discussed in the articles. Petition at 22 (citing Report of the Special Counsel Regarding the Review of Justice Eakin's Personal Email Communications, Joseph A. Del Sole, Oct. 30, 2015, attached as Exhibit 4, at 11). Although Justice Eakin did not send any emails that the Special Counsel characterized as racist, homophobic, or otherwise discriminatory to any group other than women, the Special Counsel noted that Justice Eakin also received "a substantial number of emails with jokes which are racially insensitive and disparaging of women and other groups," including Latinos, African-Americans, Muslims, and homosexuals. Report of the Special Counsel, Exhibit 4, at 13.

---

[8] This is not a "gratuitous" recitation of irrelevant emails. *See* Opinion in Support of Affirmance (Dougherty, J.) at 4, n.1. Rather, Blakeney's claim of judicial bias, as explained below, was in part rooted in the shared nature of emails that, if revealed by other individuals involved, could cause professional embarrassment to Justice Eakin. This potential embarrassment was not limited to apparent religious or racial bias, but extended also to emails that the *Inquirer* described as "raunchy, racist, sexist or just downright stupid." Bender, *A Supreme Court Justice's Indecent Inbox*, THE PHILADELPHIA INQUIRER, Oct. 8, 2015. As the *Inquirer* explained, and as Blakeney alleged, "lewd or pornographic material . . . could be used as future leverage over a judge." *Id.*

According to the Special Counsel, many of these emails are repugnant in the eyes of the public. *Id.* at 24.

Within sixty days of the publication of the *Inquirer* and *Eagle* articles, on November 30, 2015, Blakeney filed his second PCRA petition, the timeliness of which is at issue in this appeal. In the Petition, Blakeney raised claims premised upon information discovered in the articles. In particular, Blakeney alleged that *ex parte* communications occurred between members of the Dauphin County District Attorney's Office (including then-District Attorney Marsico and then-First Assistant District Attorney Chardo), the Dauphin County bench, and Justice Eakin.

Blakeney asserted that these communications evinced a personal relationship of sufficient closeness and trust to demonstrate judicial bias, or at least the appearance thereof, and the loss of objectivity in the handling and disposition of cases on the part of Justice Eakin. *Id.* at 13, 14, 27 ("At some point a relationship goes beyond mere professional acquaintanceship to one where personal fealty could well supplant the duty of impartiality, even unconsciously."). In this respect, Blakeney averred that Justice Eakin's involvement in the exchange of offensive emails, which included racial humor, stereotypes, and "jokes" manifesting negative views of Muslims, was an embarrassing activity that Justice Eakin would wish to keep private. Blakeney asserted that:

> The shared, highly offensive emails during the pendency of [Blakeney's] case creates the appearance, if not the actuality of Justice Eakin's bias in favor of the Commonwealth's and against [Blakeney's] interests. . . Their willingness to be included on emails that denigrate minorities and women, and those of certain faiths − particularly the Muslim faith − demonstrates a relationship of sufficient closeness and trust to create bias and loss of objectivity in the handling and disposition of cases. Indeed, those who exchange such publicly offensive emails − and potentially professionally embarrassing communications − rely upon each other to hold them confidential.

Petition, 11/30/2015, at 14; *see also id.* at 13 (asserting that communications that included Justice Eakin, members of the District Attorney's Office, and members of the Public Defender's Office "indicate personal relationships that create actual bias, or at the very least an appearance of bias on the part of the Justice"); *id.* at 26 (relying upon reports "that Justice Eakin sent and/or received sexist, racist, and homophobic emails on an email network that included the Dauphin County District Attorney, his First Assistant, as yet unnamed judges on the Dauphin County bench, and even the county's public defender"); *id.* (characterizing Justice Eakin's involvement in offensive emails as "an embarrassing activity which [Justice Eakin] wished to keep private. . . . The Dauphin County District Attorney . . . was aware of these practices and could expose these practices at any time, undermining [Justice Eakin's] independence, integrity, and impartiality").

Because members of the District Attorney's Office were also party to some of the emails, and could expose the Justice at any time, Blakeney asserted that Justice Eakin was beholden to the prosecution to keep his emails private. Blakeney averred that such circumstances undermined Justice Eakin's independence, impartiality, and integrity.

According to Blakeney, the emails also demonstrated additional judicial bias, or the appearance thereof, on the part of Justice Eakin arising from the nature and content of the religiously, racially, and sexually offensive messages. *Id.* at 13. In furtherance of this argument, Blakeney alleged that Justice Eakin's judicial bias was particularly prejudicial in light of the fact that Blakeney made his religion part of his case. Blakeney observed that Justice Eakin participated in Blakeney's direct appeal and in Blakeney's PCRA appeal, and that the emails were sent between 2008 and 2012, when Blakeney's

direct appeal was pending in this Court, when his PCRA was pending in the PCRA court, and when his PCRA appeal was pending before this Court.[9]

Blakeney asserted that Justice Eakin's participation in his case violated his right to due process of law. *Id.* at 15. In particular, the Due Process Clause of the United States Constitution entitles a person to an "impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). Even absent proof of actual bias, the Constitution protects against the probability of prejudice. *See Caperton v. A.T. Massey Coal Co. Inc.*, 556 U.S. 868, 881 (2009) (providing that the inquiry "asks not whether the judge is actually, subjectively biased, but whether the average judge in

---

[9] Justice Dougherty considers Blakeney's claim to be limited to one of religious and racial bias, and finds dispositive to the Petition's timeliness the fact that, according to the articles, Justice Eakin received a single religiously offensive email and sent none. Respectfully, we perceive this view to be incorrect.

First, this position disregards the premise of Blakeney's claim of judicial bias. The judicial bias alleged in the petition derived not only from Justice Eakin's alleged personal bias against African-Americans and Muslims, but also, and primarily, from the inclusion in the emails of certain prosecutors from the Dauphin County District Attorney's Office. Nowhere does Blakeney limit his claim to emails that target his own race and religion.

Second, considering the scope of his claim, it is obvious that Blakeney does not rely upon a lone email. Rather, Blakeney relies upon all of the emails reported in the articles and by the Special Counsel that are repugnant generally and which are disparaging to particular groups.

Third, Blakeney's claim of judicial bias is not limited to emails which Justice Eakin sent to his network of law enforcement officials. It also encompasses emails received by Justice Eakin, which, according to Blakeney, demonstrate Justice Eakin's intimacy with the office prosecuting Blakeney, and which could have tempted Justice Eakin to align with the prosecution in Blakeney's appeals. As the Special Counsel noted, at no point did Justice Eakin object to receiving such emails. Exhibit 4, at 11.

Finally, Justice Dougherty considers the Special Counsel to be a "neutral source" that "contradict[s] the 'fact'" that Blakeney alleges. *See* Opinion in Support of Affirmance (Dougherty, J.) at 4. To the contrary, the Special Counsel's characterization of the offensive nature of the emails substantiates the claim of judicial bias that Blakeney asserts.

his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias'") (citing *Mayberry v. Pennsylvania*, 400 U.S. 455, 465-66 (1971)). Based upon the emails, Blakeney asserted that Justice Eakin's judicial bias deprived Blakeney of an impartial tribunal and created a structural defect that rendered the proceedings fundamentally unfair and unconstitutional. Blakeney also claimed that Justice Eakin's judicial bias violated Blakeney's equal protection rights, his Eighth Amendment right to fairness and reliability in capital proceedings, his Sixth Amendment right to effective counsel at trial, his Fourteenth Amendment right to effective counsel on appeal, and his Pennsylvania law-based right to effective counsel throughout his first PCRA petition and appeal.

Finally, Blakeney asserted that the involvement of members of the District Attorney's office in the email exchanges raised "concerns as to whether [Blakeney's] prosecution, including the choice to proceed with the case as a death penalty case, and including the manner in which the jury was selected, was fair and unbiased." Petition at 31. It should be emphasized that, while Blakeney raised this concern, his assertions regarding involvement of the Commonwealth's attorneys in the email exchanges were made in service of his claim of judicial bias, rather than any claim of prosecutorial misconduct. As relief for his claim of judicial bias, Blakeney sought the reinstatement of his direct appeal and/or PCRA appeal in light of Justice Eakin's participation in those appeals.

Recognizing that the Petition was untimely on its face (because it was filed over a year from the date that his conviction became final in 2009), Blakeney invoked two

timeliness exceptions to the PCRA's one-year time-bar: Section 9545(b)(1)(i) (governmental interference) and Section 9545(b)(1)(ii) (newly-discovered facts).[10]

On February 24, 2016, the Commonwealth filed its response. In that response, the Commonwealth did not dispute the timeliness of the Petition. Rather, the Commonwealth conceded that the Petition was, in fact, timely. Commonwealth's Response to PCRA Petition, 2/24/2016, at ¶ 9 ("As the facts underlying the claims in [Blakeney's] second PCRA petition were unknown to him and could not have been discovered by the exercise of due diligence, the petition is not untimely.").

Nor did the Commonwealth address the underlying claim of judicial bias on the part of Justice Eakin. Rather, the Commonwealth's sole response was to argue simply that Blakeney was not entitled to relief on his underlying claim because "there was no improper communication between the attorneys for the Commonwealth and Justice Eakin." *Id.* at ¶ 10. In this respect, the Commonwealth relied upon affidavits submitted

---

[10] These subsections provide as follows:

(b) Time for filing petition.--

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence;

42 Pa.C.S. §§ 9545(b)(1)(i)-(ii). In addition, "[a]ny petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date the claim could have been presented." *Id.* § 9545(b)(2).

by attorneys Marsico and Chardo asserting that they had received no communication directly from Justice Eakin. Instead, the two had received unsolicited emails from a lawyer named Terrence McGowan, who had received the emails from Justice Eakin and forwarded them to others. The affidavits asserted that the two Commonwealth attorneys neither responded to, nor forwarded, the emails. On the basis of the affidavits, the Commonwealth asked the PCRA court to deny the Petition without a hearing.

On March 7, 2016, Blakeney filed a motion to disqualify the Dauphin County District Attorney's Office from participating in the litigation of the Petition. This motion was based upon the Marsico and Chardo affidavits, which, according to Blakeney, placed those two prosecutors in the role of witnesses to the events giving rise to the claim of judicial bias in the Petition. Blakeney asserted that, as with any other witnesses, the credibility and bias of these two attorneys was subject to challenge. Consequently, Blakeney argued that continued participation by attorneys Marsico and Chardo on behalf of the Commonwealth violated the Advocate-Witness Rule contained within Rule 3.7 of the Pennsylvania Rules of Professional Conduct.[11] Blakeney asserted that the inclusion of attorneys Marsico and Chardo on the email chains demonstrated that these

---

[11] Rule 3.7 provides as follows:

A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

Pa.R.P.C. 3.7.

prosecutors have both a personal stake in the outcome of the case and an actual conflict of interest, thus warranting application of the Advocate-Witness Rule.

Also on March 7, 2016, Blakeney filed a motion to recuse all judges of the Dauphin County Court of Common Pleas, including Judge Cherry, from consideration of the Petition. Blakeney noted that media reports revealed that two unnamed members of the Dauphin County bench also were included in the email communications tied to Justice Eakin. Blakeney asserted that the PCRA court's judicial findings could involve comment upon the conduct of fellow members of the Dauphin bench or credibility determinations of these unnamed jurists, creating a conflict for the PCRA court that would give rise to the appearance of impropriety, and warranting the recusal of the entire county bench.

On June 30, 2016, the PCRA court provided notice of its intent to dismiss the Petition without a hearing, denied the motion to disqualify the District Attorney's Office, and denied the motion to recuse the Court of Common Pleas of Dauphin County. Blakeney responded by updating the PCRA court with evidence that had become available after he filed the Petition, including copies of the emails that were the subject of the *Inquirer* and *Eagle* articles and those emails that were admitted into evidence in the proceedings commenced against Justice Eakin in the Court of Judicial Discipline. On June 23, 2017, the PCRA court dismissed the Petition as untimely.

The PCRA court explained that it rejected Blakeney's reliance upon Section 9545(b)(1)(i) and (ii) because "[Blakeney's] submissions do not constitute fact, but rather a theory that the emails reflect a fact. The existence of emails, investigations or resulting reports bear no nexus to [Blakeney's] conviction and sentence." PCRA Ct. Op.,

6/23/2017, at 4.  The PCRA court provided no further analysis regarding the timeliness of the Petition.

With respect to Blakeney's request for Judge Cherry's recusal, which had been subsumed within Blakeney's request for the recusal of the entire county bench, the PCRA court held that this claim was "fully litigated or waived."  *Id.*  In particular, Judge Cherry observed that Blakeney had submitted computer discs containing more than a thousand items, yet had not identified any emails to which Judge Cherry was a party.  Judge Cherry explained that he was not responsible for reviewing the thousands of items submitted in order to identify whether his own name appeared anywhere therein.

## II.    Timeliness of the Petition

On appeal to this Court,[12] Blakeney first argues that the PCRA court erred by denying the Petition as untimely because he established the timeliness exception for newly discovered facts.  42 Pa.C.S. § 9545(b)(1)(ii); *Commonwealth v. Bennett*, 930 A.2d 1264, 1270 (Pa. 2007) (applying Section 9545(b)(1)(ii) to hold that the exception "simply requires [the] petitioner to allege and prove that there were 'facts' [upon which the claim is predicated] that were 'unknown' to him and that he exercised 'due diligence'").  In particular, Blakeney asserts that the facts (*i.e.*, the offensive emails) upon which his claim of judicial bias is predicated were unknown prior to the *Inquirer* and *Eagle* articles, and that he could not have ascertained the existence of the offensive emails any earlier by the exercise of due diligence.

---

[12]    We have jurisdiction over this appeal pursuant to 42 Pa.C.S. § 9545(d) ("A final court order under this subchapter in a case in which the death penalty has been imposed shall be directly appealable only to the Supreme Court pursuant to its rules.").  We review the PCRA court's ruling to determine whether it is supported by the record and free from legal error.  *Commonwealth v. Rainey*, 928 A.2d 215, 223 (Pa. 2007).

As further support, Blakeney relies upon our recent decision in *Commonwealth v. Chmiel*, 173 A.3d 617 (Pa. 2017). In *Chmiel*, this Court held that an FBI press release admitting errors in a high percentage of cases involving FBI testimony on microscopic hair analysis was a fact that triggered the sixty-day window within which Chmiel was entitled to file his claim that the hair comparison analysis admitted at trial was flawed. *Chmiel*, 173 A.3d at 626. Blakeney asserts that the reasoning of *Chmiel* refutes the PCRA court's rationale that the *Inquirer* and *Eagle* articles, or the emails themselves, were not the facts upon which Blakeney's claim of judicial bias is predicated. Disputing the PCRA court's assertion that there was no nexus between the newspaper articles and Blakeney's conviction or sentence, Blakeney argues that this analysis goes to the merits of the underlying claim of judicial bias, not to the timeliness of that claim. Blakeney also observes that the Commonwealth did not argue to the PCRA court that the Petition was untimely, did not dispute the emails' existence or their offensive nature, and did not maintain that Blakeney could have known about the emails sooner.[13]

The Commonwealth responds by claiming, for the first time on appeal, that Blakeney's PCRA petition is untimely, and not subject to any timeliness exception, because the emails have no relationship to Blakeney's case. This position is grounded solely upon the Commonwealth's assertion that no prosecutor exchanged emails with

---

[13] Blakeney also relied upon the timeliness exception for governmental interference, Section 9545(b)(1)(i), asserting that he did not know about the emails before the articles were published due to the actions of government agents. In particular, Blakeney asserted that the numerous shared, offensive emails were in the possession and control of the OAG, which released the emails selectively over time. Not until publication of the articles did the offensive emails and their link to Justice Eakin become public. Because we resolve the timeliness of the Petition solely under Section 9545(b)(1)(ii), we express no view upon the applicability of the governmental interference exception of Section 9545(b)(1)(i).

Justice Eakin, or, in the alternative, that the attorneys for the Commonwealth did nothing more than receive emails.

Pursuant to Section 9545(b), a PCRA petition has to be filed within one year of the date the judgment becomes final, "unless the petition alleges and the petitioner proves" that one of the timeliness exceptions applies. 42 Pa.C.S. § 9545(b). As we have explained, a petitioner has the burden to plead and prove the applicability of the timeliness exceptions. *Commonwealth v. Pursell*, 749 A.2d 911, 914 (Pa. 2000). To prove the exception for newly discovered facts, the petitioner must show that "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." 42 Pa.C.S. § 9545(b)(1)(ii). A petition invoking this exception must be filed "within 60 days of the date the claim could have been presented." *Id.* § 9545(b)(2). As the PCRA court's conclusion did not rest upon Section 9545(b)(2), we focus solely upon Section 9545(b)(1)(ii).

In *Bennett,* this Court held that the timeliness exception for newly discovered facts has two components that the petitioner must allege and prove. The petitioner must "establish that: 1) 'the *facts* upon which the claim was predicated were *unknown*,' and 2) 'could not have been ascertained by the exercise of *due diligence*.'" *Bennett*, 930 A.2d at 1272 (quoting 42 Pa.C.S. § 9545(b)(1)(ii)) (italics in original). If the petitioner can establish both of these components, then the PCRA court has jurisdiction over the claim.

In *Chmiel*, the petitioner filed an untimely PCRA petition alleging that his conviction and death sentence rested upon unreliable hair comparison evidence in violation of the Constitution. *Chmiel*, 173 A.3d at 621. This Court held that the FBI press release (entitled "FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of

Cases in Ongoing Review") constituted a "fact" for purposes of Section 9545(b)(1)(ii). Because Chmiel's claim challenged the hair comparison analysis that had been used at his trial, and because this post-conviction claim was predicated upon the newly discovered fact (which could not have been discovered sooner with the exercise of due diligence), we held that Chmiel properly had invoked the timeliness exception for newly discovered facts. *Id.* at 626.

With regard to the first component of Section 9545(b)(1)(ii) as articulated in *Bennett*, Blakeney has established that the facts upon which the underlying claim is predicated were unknown. The claim that Blakeney raised in the Petition is one of judicial bias, premised upon the argument that Justice Eakin's participation in Blakeney's direct appeal and PCRA appeal violated various constitutional guarantees. The fact upon which the claim is predicated is the group of emails, and the bias of Justice Eakin that they suggest. With the publication of the newspaper reports, Blakeney, an African-American and a Muslim, learned that a member of this Court had exchanged emails denigrating African-Americans and Muslims. Blakeney also learned that Justice Eakin had exchanged many other offensive emails with members of the prosecution, suggesting a relationship of sufficient closeness that threatened Justice Eakin's objectivity. These newly discovered facts revealed the potential for judicial bias that Blakeney believes unconstitutionally infected his appeals before this Court. The claim of judicial bias is predicated upon the existence and content of offensive emails transmitted by a sitting member of the court of last resort empowered to adjudicate Blakeney's two appeals (save for any resort to a federal forum).

Turning to the second component of Section 9545(b)(1)(ii) as defined in *Bennett*, Blakeney could not, by the exercise of due diligence, have ascertained that Justice Eakin sent and received offensive emails. This fact was not made public until the *Inquirer* and *Eagle* articles. Consistent with *Bennett* and *Chmiel*, the existence of the offensive emails, the content of which was revealed to the public with the publication of the newspaper reports and which serve as the factual predicate for Blakeney's underlying claim, satisfies the exception for newly discovered facts.

The PCRA court's assertion that Blakeney's "submissions do not constitute fact, but rather a theory that the emails reflect a fact" is puzzling. PCRA Ct. Op. at 4. The *Inquirer* and *Eagle* articles revealed the content of several racially and religiously offensive emails. As further emails became public, Blakeney updated the PCRA court as to their existence as well. There was nothing theoretical about the disparagement that the emails revealed. Rather, the emails revealed facts about a High Court jurist who participated in Blakeney's direct appeal and PCRA appeal, and those facts served as the predicate for a claim of judicial bias. The PCRA court also suggested that the emails bear no nexus to Blakeney's conviction or sentence. The law does not require a "nexus" between the newly-discovered facts and the conviction or sentence for purposes of satisfying the timeliness exception requirements of the PCRA. Rather, as explained above, Section 9545(b)(1)(ii) requires that the facts upon which the claim are predicated were previously unknown. Whether the newly-discovered facts bear a sufficient nexus to Blakeney's conviction or sentence for purposes of demonstrating judicial bias that exceeds constitutional standards is an assessment of the merits of the underlying claim. Consideration of the merits is distinct from a timeliness analysis. *Commonwealth v.*

*Stokes*, 959 A.2d 306, 310 (Pa. 2008).[14]  The question for timeliness purposes is whether the newly-discovered facts form a predicate for the underlying claim.  Under our precedent, in this case, they do.[15]  *Chmiel*, 173 A.3d at 625-26; *Bennet*, 930 A.2d at 1272-

---

[14]     Viewing Blakeney's claim as predicated solely upon a single email that Justice Eakin received, Justice Dougherty would find no connection between the claim of judicial bias and that email.  *See* Opinion in Support of Affirmance (Dougherty, J.) at 5.  With all due respect, this analysis improperly minimizes Blakeney's claim so as to exclude the judicial bias that Blakeney asserts derives from the inclusion of other individuals in the email exchanges.  This highly constricted perspective also leads Justice Dougherty to ignore the other embarrassing emails detailed in the articles, all of which form the foundation for Blakeney's claim of judicial bias.

We disagree with Justice Dougherty's view that there is no connection between the claim of judicial bias and the newly discovered fact.  The fact upon which the claim of judicial bias is predicated is the existence of the offensive emails.  This parallels the claim, and the fact upon which the claim was predicated, in *Chmiel*.  In both instances, the claim (judicial bias that may have permeated Blakeney's appeal, and questionable hair comparison analysis that contributed to Chmiel's conviction) is predicated upon the newly discovered fact (emails suggesting judicial bias in Blakeney's appeal, and the FBI's admissions concerning evidence introduced against Chmiel).  In both instances, the petitioners satisfied Section 9545(b)(1)(ii).

Justice Dougherty's assertion that Justice Eakin's personal beliefs are unknown, *see* Opinion in Support of Affirmance (Dougherty, J.) at 6, is a merits consideration of Blakeney's claim.  Justice Eakin's personal beliefs about the content of the emails and about the fealty he may have felt towards the prosecution is a question that may be relevant to the merits of the underlying claim.  But it is not pertinent for jurisdictional purposes.  The adequacy of Blakeney's proof to establish a claim for relief is not before us.

[15]     This is not to suggest any entitlement to relief on the merits.  Satisfaction of the PCRA's timeliness requirements means only that a PCRA court has jurisdiction to entertain a petitioner's claim.  To merit relief, a petitioner still would need to satisfy the other requirements of the PCRA, such as establishing that the petitioner's conviction or sentence resulted from one or more of the circumstances enumerated in Section 9543(2), 42 Pa.C.S. § 9543(2).  Failure to make such a showing is grounds for the denial of relief.

To the extent that Justice Dougherty wishes to save the "overly-encumbered" PCRA courts from examining the merits of PCRA petitions, *see* Opinion in Support of Affirmance (Dougherty, J.) at 4, we believe that such concern is misplaced.  A petitioner's right to receive review in accord with the PCRA does not depend upon how busy the courts may be.  In addition, directing the PCRA court to assess the timeliness of PCRA petitions in accord with the PCRA and this Court's precedent does not necessarily add to

73. We therefore disagree with the PCRA court on the question of the Petition's timeliness relative to the exception for newly-discovered facts. 42 Pa.C.S. § 9545(b)(1)(ii).

The Commonwealth's suggestion that the timeliness of Blakeney's Petition depends upon whether the Commonwealth attorneys exchanged emails with Justice Eakin or merely received emails is inapt. The emails allegedly reveal judicial bias on the part of Justice Eakin that arises from the offensive content of the emails and their apparent circulation to members of the District Attorney's Office, which assertedly could have caused Justice Eakin to be partial to the Commonwealth's position in Blakeney's appeals before this Court. The question for timeliness purposes is whether the facts upon which the claim of judicial bias is predicated were unknown and could not have been ascertained by the exercise of due diligence. Whether prosecutors Marsico and Chardo exchanged emails with Justice Eakin or merely received them has no bearing upon whether the Petition is timely.

On this issue, Justice Dougherty characterizes the newspaper articles reporting on the emails as allegations lacking in "any genuine basis" and contradicted by neutral sources. *See* Opinion in Support of Affirmance (Dougherty, J.) at 4. We disagree on both counts. The articles were premised upon emails that former Attorney General Kathleen Kane turned over to the Judicial Conduct Board and the State Ethics Commission.

---

PCRA courts' workloads. Establishing jurisdiction does not entitle a petitioner to relief; indeed, it does not even entitle a petitioner to a hearing. *See Commonwealth v. Morris*, 684 A.2d 1037, (Pa. 1996) (providing that the right to an evidentiary hearing is not an absolute one; a hearing should only be held on any issue which the PCRA court is not certain lacks merit).

Although the emails themselves were disclosed to the media by anonymous sources, there is no reason to doubt the accuracy of the information that the media reported. We have never held that media reports cannot be the source of newly discovered facts for purposes of Section 9545(b)(1)(ii).[16]

In this case, Blakeney relied upon the articles as the trigger to comply with the sixty-day requirement of Section 9545(b)(1)(ii). He appended the Report of the Special Counsel to his petition, which supported the allegations reported in the articles. Recognizing that he could not yet discern the precise nature and scope of the constitutional violations he alleged, Blakeney also updated the PCRA court as he discovered new information. We do not fault Blakeney for choosing to protect his rights by filing the Petition within sixty days of the first time he became aware of this indication of judicial bias.

It appears that the "neutral source" to which Justice Dougherty refers is the Special Counsel's report. However, this report did not contradict the articles. Rather, as explained above, it corroborated the information provided therein.

Justice Dougherty also maintains that a petitioner is required to prove the new fact upon which his claim is predicated. *See* Opinion in Support of Affirmance (Dougherty, J.) at 2. In fact, a petitioner is required only to allege and prove that one of the timeliness

---

[16] *See Chmiel*, 173 A.3d at 621 (concluding that the petitioner established the applicability of Section 9545(b) when he filed a petition within sixty days of a newspaper report about the FBI press release); *Commonwealth v. Edmiston*, 65 A.3d 339, 351 (Pa. 2013) (holding that studies and articles in the public domain defeated the petitioner's reliance on a new report to establish newly discovered facts). *But see Commonwealth v. Burton*, 158 A.3d 618, 620 (Pa. 2017) (holding that the public record presumption does not apply to *pro se* prisoner petitioners).

exceptions applies. Substantiating the veracity of the fact upon which the claim is predicated is a question for merits review of the claim. *See* 42 Pa.C.S. § 9543(a).

## III.   Disqualification of the District Attorney's Office

Blakeney also argues that the trial court erred by denying his motion to disqualify the Dauphin County District attorney's Office and to recuse the Dauphin County Court of Common Pleas, including Judge Cherry. As to the District Attorney's Office, Blakeney relies upon the affidavits from attorneys Marsico and Chardo to assert that these prosecutors were parties to the offensive emails that form the factual predicate of the underlying claim of judicial bias. Blakeney argues that the emails ultimately received by attorneys Marsico and Chardo demonstrate that Justice Eakin trusted the recipients to keep the emails confidential, lest he suffer professional humiliation, and that such a relationship undermines the appearance of neutrality and lack of bias on the part of Justice Eakin. Blakeney does not allege that attorneys Marsico or Chardo did anything improper. Brief of Appellant at 31 ("[I]t has never been [Blakeney's] claim that Mr. Marsico or Mr. Chardo did anything improper. The bias instead lies with Justice Eakin, and in particular, with the fact that he sent, or was party to, offensive emails to litigants in cases before this Court and therefore knew that those same litigants were aware of his connection to the offens[iv]e emails."). Blakeney's disqualification argument is premised upon the Advocate-Witness Rule. He argues that the Marsico and Chardo affidavits have created a factual dispute that will compel the PCRA court to consider the affiants' credibility, thereby placing Attorneys Marsico and Chardo into the role of witnesses to the factual predicate of the underlying claims. According to Blakeney, their appearance as

counsel for the Commonwealth therefore runs afoul of the Advocate-Witness Rule. *See* Pa.R.P.C. 3.7.

In response, the Commonwealth argues simply that there are no grounds for the relief requested because there was no improper communication between Justice Eakin and the attorneys for the Commonwealth.

The sole basis upon which Blakeney seeks the disqualification of the District Attorney's Office is the Advocate-Witness Rule. This rule is implicated when a lawyer "is likely to be a necessary witness" at trial. *Id.* "Combining the roles of advocate and witness can prejudice the tribunal and the opposing party and can also involve a conflict of interest between the lawyer and client." *Id.*, Cmt. [1].

There is no reason to believe that attorneys Marsico or Chardo are likely to be witnesses in Blakeney's PCRA proceedings. As Blakeney concedes, his claim is that Justice Eakin was biased, not that attorneys Marsico or Chardo did anything improper. In seeking to prove his claim that Justice Eakin was biased, and that Justice Eakin trusted the recipients of the emails to keep the emails confidential, Blakeney can introduce the emails into evidence. To the extent that the claim of judicial bias rests upon Justice Eakin's knowledge of the recipients or senders of the emails, the emails sent by or received by Justice Eakin, along with the identity of the sender and recipients and/or their email addresses, will provide this information. Blakeney will not need to establish whether attorneys Marsico or Chardo understood that they received emails that included Justice Eakin somewhere along the chain, asked for the emails to be halted, complained about the emails to the sender, or forwarded the emails along to other individuals. The testimony of the Commonwealth attorneys is irrelevant to the underlying claim of judicial

bias. Accordingly, Blakeney's request for disqualification of the District Attorney's Office fails.

## IV. Recusal of the PCRA Court

With respect to the question of judicial recusal, Blakeney argues that Judge Cherry should have removed himself from the case, and that the entire Dauphin County Court of Common Pleas should likewise recuse. Blakeney's argument as to Judge Cherry is twofold: First, according to Blakeney, Judge Cherry was a recipient of email blasts from attorney Terry McGowan, including emails of which Justice Eakin and Dauphin County prosecutors were recipients. On this basis, Blakeney asserts that Judge Cherry has personal knowledge of disputed facts. Second, Blakeney asserts that Judge Cherry was compromised in his role of presiding over Blakeney's trial and PCRA petition by his role on the Dauphin County Prison Board. *See Blakeney I*, 946 A.2d at 661-62, *Blakeney II*, 108 A.3d at 761.

The Commonwealth argues that Blakeney's recusal motion as to Judge Cherry is barred by the law of the case doctrine because this Court previously considered and rejected Blakeney's claim that Judge Cherry should have recused because of his role on the Dauphin County Prison Board.

To the extent that Blakeney seeks Judge Cherry's recusal because of Judge Cherry's alleged receipt of emails that involved Justice Eakin and Dauphin County prosecutors, this claim is waived. As the PCRA court observed, although Blakeney baldly asserted that Judge Cherry was included in one or more email chains that involved Justice Eakin, Blakeney did not identify any emails received by Judge Cherry. Blakeney's counsel submitted computer discs to the PCRA court that contained over a thousand

items, but failed to specify which items implicated Judge Cherry. Consequently, Judge Cherry refused to respond to Blakeney's unsubstantiated claims or to identify whether, and to what extent, Judge Cherry's name was on any of the emails, essentially concluding that Blakeney's failure to identify with precision which emails were linked to Judge Cherry resulted in waiver. Blakeney has not confronted the PCRA court's waiver analysis.

By failing to identify any emails to which Judge Cherry was a party, and by failing entirely to develop the extent to which Judge Cherry had personal knowledge of the facts at issue in the Petition, Blakeney has waived this aspect of his recusal motion. *See Commonwealth v. Briggs*, 12 A.3d 291, 326 n.34 (Pa. 2011) (concluding that an entirely undeveloped claim is waived).

To the extent that the recusal motion depends upon a conflict allegedly arising from Judge Cherry's role on the Dauphin County Prison Board, Blakeney did not raise this issue in his recusal motion before the PCRA court. It is, therefore, also waived. Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Moreover, the Commonwealth is correct that we considered and rejected this claim on direct appeal, *Blakeney I*, 946 A.2d at 662 (finding no grounds for recusal on the basis of Judge Cherry's involvement with the Prison Board where "[t]he record reveals that Judge Cherry was, in fact, fair and impartial, and indeed, that he demonstrated a great deal of patience when interacting with the *pro se* appellant"), and on appeal from the denial of Blakeney's first PCRA petition, *Blakeney II*, 108 A.3d at 761 (holding that Blakeney's challenge to Judge Cherry's failure to recuse himself was previously litigated). Pursuant to the law of the case doctrine, there is no basis for recusal premised upon

Judge Cherry's involvement with the Prison Board. *See Ario v. Reliance Ins. Co.*, 980 A.2d 588, 597 (Pa. 2009) ("The law of the case doctrine sets forth various rules that embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter.").

Accordingly, there is no basis to require the recusal of Judge Cherry. Because we affirm Judge Cherry's refusal to recuse himself, there is no need to address Blakeney's argument that the rest of the Dauphin County Court of Common Pleas should be recused.

Justice Donohue joins the opinion.

Justice Dougherty concurs in the result as to Parts III and IV and files an opinion in support of affirmance as to Parts I and II.

Justice Mundy concurs in the result as to Parts III and IV and files an opinion in support of affirmance as to Parts I and II.

Chief Justice Saylor and Justices Baer and Todd did not participate in the consideration or decision of this case.