**[J-51-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 720 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated |
| | : | 12/8/2015 in the Court of Common |
| | : | Pleas, Cumberland County, Criminal |
| v. | : | Division at No. CP-21-CR-0001183- |
| | : | 1996 |
| | : | |
| ANTYANE ROBINSON, | : | SUBMITTED:  June 11, 2018 |
| | : | |
| Appellant | : | |

## <u>OPINION IN SUPPORT OF REVERSAL</u>

**JUSTICE DONOHUE**                                             **DECIDED:  December 14, 2018**

In this capital appeal, we review the dismissal, on timeliness grounds, of the third

petition for relief filed by Appellant Antyane Robinson ("Robinson") pursuant to the Post

Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546 ("PCRA").[1]  Robinson's petition, raising

a due process violation, is premised upon the receipt and delivery of offensive emails by

former Pennsylvania Supreme Court Justice J. Michael Eakin ("Eakin") and possible ex

---

[1]  A PCRA petition must be filed within one year of the date a criminal defendant's judgment of sentence becomes final for a court to have jurisdiction to decide the merits of the claims raised therein.  42 Pa.C.S. § 9545(b)(1); *Commonwealth v. Mitchell*, 141 A.3d 1277, 1284 (Pa. 2016).  The PCRA provides several exceptions to the one-year time bar including circumstances wherein "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence" and the petition is filed within sixty days of the date the claim could have been presented.  42 Pa.C.S. § 9545(b)(1)(ii), (2).

parte communication between Eakin and members of the Office of the Cumberland County District Attorney (the "DA"). We are also asked to decide whether the DA should be disqualified from participating in this matter based on the connection between the DA and Eakin that was exposed through Eakin's disciplinary proceedings. For the reasons that follow, we would conclude that Robinson satisfied the newly discovered fact exception to the PCRA's one-year time requirement and filed his petition within sixty days of the date his claim could have first been brought. We further would conclude that the particular facts and circumstances of this case require the disqualification of the DA from further proceedings. We would hold that, on remand, the President Judge of the Cumberland County Court of Common Pleas must refer the matter to the Office of the Attorney General ("OAG") who, in the absence of a conflict, would represent the Commonwealth in this matter. The PCRA court would also be ordered to give renewed consideration to Robinson's requests to amend his PCRA petition, for discovery and for an evidentiary hearing.[2]

The backdrop of this case is an email scandal that first came to light in 2014 following an investigation conducted by former Attorney General Kathleen Kane into her predecessor's handling of an unrelated matter. This investigation uncovered emails sent from and received by members of her office on Commonwealth owned computers that contained racist, sexist, misogynistic, homophobic, and religiously and ethnically insensitive content. Their piecemeal release revealed individuals from all three branches of the Commonwealth's government as having sent and/or received these emails.

---

[2] As we discuss herein, our decision regarding Robinson's PCRA claims are solely limited to whether Robinson satisfied an exception to the PCRA's timeliness requirements. We have not considered the merits of the substantive claims raised in the PCRA petition.

Of relevance to the case at bar, in October 2014, news articles reported that former Pennsylvania Supreme Court Justice Seamus McCaffery sent and received numerous of these offensive emails. Shortly thereafter, Eakin was also implicated in the scandal. As discussed herein, the story of Eakin's involvement broke on or about October 8, 2014, and continued to evolve and develop through his suspension from judicial and administrative responsibilities on December 22, 2015, resignation on March 15, 2016, and decision by the Court of Judicial Discipline ("CJD") on March 24, 2016.

With this background in mind, we turn to the case before us. On March 13, 1997, a jury convicted Robinson of the attempted murder of Tara Hodge, Robinson's on-again/off-again paramour, and the first-degree murder of Rashawn Bass, Hodge's boyfriend.[3] The evidence at trial revealed that on June 29, 1996, sometime after receiving a letter from Hodge ending their relationship, Robinson drove from his home outside of Washington, D.C. to her apartment in Carlisle, Pennsylvania. Upon learning that she was not alone, Robinson and Hodge began to argue. Robinson requested that Hodge tell her guest to leave. When she refused, Robinson pulled a gun from his waistband and shot Hodge in the head. She lost consciousness but survived. Robinson then went into the bathroom where Bass was showering and shot him seven times, killing him almost instantly. Robinson then fled the scene.

The elected DA at that time, Merle L. Ebert, Jr. ("Ebert"), tried the case on behalf of the Commonwealth. The theme of the prosecution was that Robinson was a gun-toting

---

[3] *See* 18 Pa.C.S. §§ 2502(a), 901(a). The jury also convicted Robinson of related charges, including aggravated assault, using a firearm in the commission of a crime, and carrying a firearm without a license. 18 Pa.C.S. §§ 2702(a)(1), 6103, 6106(a)(1).

criminal from the "big city" who came to Cumberland County with the intent to kill because he had been "disrespected" by Hodge.[4]  *See, e.g.,* N.T., 3/12/1997, at 6; N.T., 3/13/1997, at 271, 273, 277.  In his defense, Robinson did not deny that he shot both Hodge and Bass, but contended that he lacked the intent to kill or to attempt to kill.  *See* N.T., 3/13/1997, at 265-67; N.T., 3/14/1997, at 366-67.

The jury sentenced Robinson to death the following day.  This Court affirmed his judgment of sentence on November 24, 1998.  *Commonwealth v. Robinson*, 721 A.2d 344 (Pa. 1998) ("*Robinson I*").  The United States Supreme Court denied his petition for certiorari on January 10, 2000, at which time Robinson's judgment of sentence became final.  *Robinson v. Pennsylvania*, 528 U.S. 1082 (2000); *see* 42 Pa.C.S. § 9545(b)(3) ("For

---

[4]  For example, in his closing argument to the jury, DA Ebert stated:

> Now, there was an image projected here, and it's that big city image.  You'll get to look at this.  ["]Man, I got to carry a gun wherever I go.["]  He's not the person in here that ["]all my life I've been treated so badly.["]  This is the image of a kind of person capable of forming specific intent to kill.  This is a lifestyle.

> \*   \*   \*

> I would say an ordinary person doesn't want to do that, but a person that wants to project this kind of image, the kind of guy that has to drive into Cumberland County and have guns in his waistband and his home has to have a bullet proof vest, those are the kind of guys I submit to you that say ["]I ain't going to be disrespected, disrespect me and you're going to have to pay.["]

N.T., 3/13/1997, at 273, 277.  This theme was buttressed at trial with the admission of guns and ammunition unrelated to the crimes at issue, photographs of money and unrelated firearms, pictures of Robinson posing holding several different guns (none of which were used in the perpetration of the crime in question), and a bulletproof vest.  Commonwealth's Exhibits 36, 38, 39.  The Commonwealth used these exhibits to demonstrate Robinson's "lifestyle and image" and that he "was capable of forming the specific intent to kill."  *See Robinson I*, 721 A.2d at 351.

purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United Sates and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review.").

Represented by new counsel, Robinson filed a timely PCRA petition on October 16, 2000. Following an evidentiary hearing, the Honorable Edgar B. Bayley, who also served as the trial court judge, denied the petition on April 22, 2002.

Robinson appealed the denial of his PCRA petition to this Court. Robinson raised twelve issues for the Court's review. In a divided four-to-three opinion, this Court affirmed. The majority opinion, authored by Eakin, found five issues were previously litigated and the remaining seven meritless. *Commonwealth v. Robinson*, 877 A.2d 433 (Pa. 2005) ("*Robinson II*"). Notably, Robinson, an African-American man, raised a claim that the DA's portrayal of him as a big-city criminal who killed out of retribution for perceived disrespect "had a definite racial overtone" that constituted prosecutorial misconduct and that trial counsel was ineffective for failing to object to the DA's injection of race into the case.[5] *Id.* at 441. He further alleged counsel's ineffectiveness for failing to present evidence at his penalty phase hearing regarding, inter alia, his exposure to domestic violence. *Id.* at 438 n.3.[6]

---

[5] A finding that trial counsel rendered ineffective assistance requires a PCRA petitioner to plead and prove that "(1) the claim has arguable merit; (2) counsel had no reasonable basis designed to advance the petitioner's interest for his/her act or omission; and (3) the petitioner suffered prejudice as a result, which, for PCRA purposes, means but for counsel's act or omission, there is a reasonable probability that the result of the proceeding would have been different." *Commonwealth v. Sepulveda*, 144 A.3d 1270, 1273 n.9 (Pa. 2016) (citing *Commonwealth v. Treiber,* 121 A.3d 435, 445 (Pa. 2015)).

[6] Robinson's claim concerning his exposure to domestic violence was stated as an entitlement to PCRA relief based on "[t]rial counsel's failure to investigate and present at sentencing the readily available evidence of [Robinson's] increasingly paranoid behavior,

In the majority opinion, Eakin did not specifically address the domestic abuse averment, but rather decided the issue based on trial counsel's efforts to obtain information about Robinson's family background. *See id.* at 448. The majority opinion addressed the race-related argument by finding that the Commonwealth did nothing improper: "Here, the prosecutor's remarks were not a deliberate attempt to destroy the objectivity of the jury, but merely summarized the evidence presented at trial with oratorical flair permitted during argument." *Id.* at 442. Because the DA did not mention Robinson's race, the majority concluded that the claim that trial counsel was ineffective for failing to object was without merit. Then-Justice (now-Chief Justice) Saylor authored a comprehensive dissenting opinion wherein he stated his view that the prosecutor's statements in this latter regard were improper. *Id.* at 451 (Saylor, J., dissenting).[7]

In 2005, Ebert was elected to serve as a judge in the Cumberland County Court of Common Pleas and was succeeded as DA by Attorney David J. Freed ("Freed"). Robinson filed a counseled writ of habeas corpus in the United States District Court for the Middle District of Pennsylvania, and Chief Deputy DA Matthew P. Smith ("Smith") and

---

paranoid schizophrenia, family dysfunction and abuse, diminished capacity and emotional trauma at the time of the offenses deprived him of his constitutional right to the effective assistance of counsel." *Robinson II*, 877 A.2d at 438 n.1.

[7] Justice Saylor ultimately agreed with the majority that Robinson's ineffectiveness claim could not succeed, however, based on Robinson's failure to meet the reasonable basis and prejudice prongs of the test for ineffective assistance of counsel. *Robinson II*, 877 A.2d at 451 (Saylor, J., dissenting). Notably, two Justices also in a dissenting posture – Justices Nigro and Baer – agreed with Justice Saylor that Robinson should receive a new penalty phase hearing based on trial counsel's ineffectiveness for failing to object to the section 9711(d)(6) aggravating circumstance (killing committed "while in the perpetration of a felony"). Justices Nigro and Saylor also would also have granted Robinson a new penalty phase hearing based on trial counsel's legally unsupportable concession that the grave-risk aggravator of section 9711(d)(7) applied where the two victims were shot separately and in different rooms. *Id.* at 452-53; *id.* at 450 (Nigro, J., dissenting).

Assistant DA Charles J. Volkert, Jr. (now Chief Deputy DA) began representing the Commonwealth in this matter. The district court denied relief on September 30, 2011. The United States Court of Appeals for the Third Circuit affirmed the denial and the United States Supreme Court denied a petition for certiorari on October 5, 2015.

With his habeas petition pending before the Third Circuit, Robinson filed a second PCRA petition pro se in the Cumberland County Court of Common Pleas on September 30, 2013. The court appointed counsel on October 3, 2013, who filed an amended petition on Robinson's behalf. The PCRA court dismissed the petition as untimely, and this Court affirmed on June 20, 2016. *See Commonwealth v. Robinson*, 139 A.3d 178 (Pa. 2016) ("*Robinson III*").

Robinson filed the instant, counseled PCRA petition on November 30, 2015, while decision on his second petition was pending before this Court.[8] In this petition, Robinson sought reinstatement of his appellate rights from his first PCRA petition, alleging newly

---

[8] Robinson filed his third PCRA petition prematurely. *See Commonwealth v. Lark*, 746 A.2d 585, 588 (Pa. 2000) (holding that "when an appellant's PCRA appeal is pending before a court, a subsequent PCRA petition cannot be filed until the resolution of review of the pending PCRA petition by the highest state court in which review is sought, or upon the expiration of the time for seeking such review," and that the petitioner must file the subsequent petition "within sixty days of the date of the order which finally resolves the previous PCRA petition, because this is the first 'date the claim could have been presented.'"). The holding in *Lark* was premised on a PCRA court's lack of jurisdiction to rule on the subsequent PCRA petition while the appeal of a prior PCRA petition in the case was pending. *Id.* Robinson recognized the jurisdictional concern, but because of the factual differences between *Lark* and the case at bar, stated that he filed the petition "in an abundance of caution to preserve [his] constitutional claims." PCRA Petition, 11/30/2015, ¶ 14. As this Court's review in *Robinson III* was completed by the time the PCRA court finally adjudicated Robinson's third PCRA petition, and because the Commonwealth does not raise an objection pursuant to *Lark*, in the interest of justice, we will regard as done that which ought to have been done and treat Robinson's third PCRA petition as though it was filed after our decision in *Robinson III*.

discovered facts regarding Eakin's transmission and receipt of offensive emails and possible ex parte communication with prosecutors.[9] Robinson alleged a violation of his due process rights based on Eakin's bias or the appearance of bias. Robinson noted that he raised claims in his first PCRA appeal, decided by Eakin, concerning the improper injection of race into his guilt phase trial by Ebert and the failure of his counsel to present evidence of his exposure to domestic violence – abuse sustained by his mother and sister at the hands of his father – as a mitigating circumstance at his penalty phase hearing. PCRA Petition, 11/30/2015, ¶¶ 39-42.

According to Robinson, Eakin's involvement in the email scandal was not known until October 8, 2015, when an online news outlet, philly.com, published the content of some of the emails that Eakin had sent and received from a personal email account he created using the pseudonym "John Smith." *Id.*, ¶ 43 (citing William Bender, *A Supreme Court Justice's Indecent Inbox*, philly.com, Oct. 8, 2015). Further, Robinson averred that a news article further reported that Ebert had received at least one of the "blast" emails sent to Eakin, which Robinson stated showed "a close relationship" that too created "an actual bias or, at a minimum, the appearance of bias." *Id.*, ¶ 46 (citing Wallace McKelvey,

---

[9] In his petition, Robinson raised an additional argument to overcome the one-year time limitation, asserting that "the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim" based on "the relevant government officials conceal[ing] the relationships and emails." PCRA Petition, 11/30/2015, ¶¶ 11-12; 42 Pa.C.S. § 9545(b)(1)(i). In a later filing, he also claimed that his right to a new PCRA appeal was a newly recognized constitutional right by the United States Supreme Court in *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016), that applies retroactively to his case. Response and Objections to Rule 909(B) Notice, 6/14/2017, at 7-9; 42 Pa.C.S. § 9545(b)(1)(iii); *see Williams*, 136 S. Ct. at 1910 (holding that a biased jurist's participation in decision of a case "was an error that affected the State Supreme Court's whole adjudicatory framework" in the matter). Because we would decide that Robinson's claim satisfies the newly discovered fact exception to the PCRA's timeliness requirement, we need not address the applicability of his other claimed exceptions.

*Porn emails raise questions about judicial ethics in Pa.*, pennlive.com, Oct. 23, 2015). Robinson asserted that because only emails from the OAG's server had been disclosed at that time, it was unknown whether there were additional emails exchanged between Eakin and members of the DA's office. *Id.*, ¶ 60.

Robinson contended that Eakin's conduct in both respects denied him his right to a fair and impartial court, and that this constituted a "structural error" requiring no showing of prejudice. *Id.*, ¶¶ 53-57, 61, 65 (citing, e.g., *Tumey v. Ohio*, 273 U.S. 510, 532 (1927); *In re Murchison*, 349 U.S. 133, 136 (1955); *Johnson v. United States*, 520 U.S. 461, 468-69 (1997); *Commonwealth v. Basemore*, 744 A.2d 717, 734 (Pa. 2000)). According to Robinson, failing to provide review by an "impartial and disinterested tribunal" that was free of bias denied him his right to a full and fair review of his initial PCRA petition, as well as effective assistance of counsel. *Id.*, ¶¶ 65-67 (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980)).

Robinson acknowledged that Eakin's involvement in the email scandal was first suggested in 2014, but he noted that former Chief Justice Castille promptly cleared Eakin of any wrongdoing. *Id.*, ¶¶ 50-51 (citing Brad Bumsted, *Castille: No Justices Except McCaffery Involved in Porn Scandal*, Pittsburgh Tribune-Review Oct. 15, 2014). He stated that even at the time of the filing of his PCRA petition, the contents of the emails most relevant to his case had not been disclosed, but that he filed his petition "[i]n an abundance of caution … within sixty days of the first occasion on which he had any basis to raise the claim." *Id.*, ¶ 11. Robinson recognized the developing nature of the information disclosed regarding the emails. *Id.*, ¶ 34.

The Commonwealth filed a response, attacking the merits of the issue raised, but making no argument concerning Robinson's failure to overcome the PCRA's one-year time bar. On December 8, 2015, the PCRA court entered an order dismissing the petition "for lack of jurisdiction in light of [Robinson's] pending appeal" of his second PCRA petition. PCRA Court Order, 12/8/2015. Robinson filed a motion for reconsideration of that order, raising therein the PCRA court's failure to comply with Rule of Criminal Procedure 909,[10] and further attempting to distinguish the circumstances of his case from that of *Commonwealth v. Lark*, 746 A.2d 545 (Pa. 2000), stating his concern that review of his claim regarding Eakin's bias would be forfeited. *See supra*, note 8. The PCRA court denied his request, but stated in its order that Robinson "clearly raised the issue of Justice Eakin's emails, which will be preserved pending the outcome of [Robinson's] current appeal." PCRA Court Order, 1/5/2016.

The next day, Robinson filed a motion to vacate the above orders and sought recusal of the entire Cumberland County bench. He filed the motion upon learning that on December 18, 2015, all but one of the sitting judges[11] signed a letter that was sent to the CJD in support of Eakin after the Judicial Conduct Board ("JCB") filed formal charges against him.[12] The Honorable Albert H. Masland, who was sitting as the PCRA court

---

[10] Rule 909 requires, in relevant part, that the PCRA court send a capital petitioner notice of its intent to dismiss a pending PCRA petition without a hearing, stating reasons for the dismissal, and provide the petitioner twenty days to respond to the notice. Pa.R.A.P. 909(B)(2).

[11] The exception was Senior Judge Wesley J. Oler, Jr.

[12] The JCB filed its complaint against Eakin on December 8, 2015, alleging violations of the 1974 Code of Judicial Conduct and Article V, Sections 17(b) and 18(d)(1) of the Pennsylvania Constitution. *See* Petitioner's Motion to Vacate the Court's December 8,

judge, granted the order, recusing himself "to avoid the appearance of a conflict of interest and allow this matter to proceed on its merits," and vacated the December 8 and January 5 orders dismissing Robinson's petition. PCRA Court Order, 1/8/2016. Judge Masland referred Robinson's request for the whole court's recusal to the Honorable Edward E. Guido, President Judge of Cumberland County. Judge Guido entered an order the same day stating "that all Common Pleas Judges of the 21st Judicial District are recused from hearing this matter in order to avoid the appearance of a conflict of interest or impropriety." Order of President Judge Guido, 1/8/2016.

In the meantime, on January 7, 2016, Robinson appealed the dismissal of his PCRA petition to this Court. On January 19, 2016, he informed the Court of the intervening change in circumstances and filed a motion to remand the case, which we granted. *See* Order, 3/18/2016.

On April 18, 2016, Robinson filed a motion in the common pleas court seeking the disqualification of the DA's office from participating further in the proceedings. The motion stated that Robinson had recently become aware that Freed had received at least one of the offensive emails in his work email account. Petitioner's Motion to Disqualify the DA's Office, 4/16/2016, ¶ 5; *see also id.* at Exhibit A. Further, Robinson had learned that both Freed and Smith sent letters in support of Eakin to the JCB. Petitioner's Motion to Disqualify the DA's Office, 4/16/2016, at Exhibits B and C. Robinson contended that these circumstances required the DA's disqualification because Freed's receipt of the email made him a witness to the events giving rise to Robinson's petition, and thus the

---

2015 Order of Dismissal and Recuse the Cumberland County Court of Common Pleas, 1/6/2016, at Exhibit A.

DA's continued participation "runs afoul of the Advocate-Witness Rule." *Id.*, ¶¶ 14-15 (citing Pa.R.P.C. 3.7).[13] Further, Robinson asserted that Freed had a personal interest in the outcome of the petition, giving rise of an actual conflict of interest that precluded his representation of the Commonwealth in this matter. *Id.*, ¶ 16. According to Robinson, a judicial finding in his favor "would potentially affect the reputations of Ebert and Freed" because of their receipt of blast emails, which demonstrates "a personal stake in the outcome of the case and an actual conflict of interest that impairs the [DA's] independent judgment as a prosecutor." *Id.*, ¶¶ 17-18 (citing *Commonwealth v. Eskridge*, 604 A.2d 700, 701 (Pa. 1992)). "Due process requires that a prosecutor be disinterested and impartial," the absence of which, Robinson stated, constitutes a violation of his "right to a fundamentally fair proceeding." *Id.*, ¶ 23 (citing, e.g., *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807-08 (1987)). Even in the absence of an actual conflict, Robinson stated that the DA's continued participation creates "the appearance of unfairness and undermines confidence in the proceedings." *Id.*, ¶ 24.

---

[13] Rule 3.7 of the Pennsylvania Rules of Professional Conduct provides:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.
>
> (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Pa.R.P.C. 3.7.

The Commonwealth filed a response. Therein, the Commonwealth advocated for the PCRA court to deny Robinson's motion because (1) the PCRA court lacked jurisdiction of the underlying PCRA petition pursuant to *Lark*; (2) the issues raised in the underlying PCRA petition were frivolous and should be dismissed out of hand; and (3) Robinson failed to demonstrate that the DA is burdened by bias or conflict. Judge Guido appointed Senior Judge Douglas W. Herman of Franklin County to specially preside and scheduled argument on the petition and the motion for June 17, 2016.

On June 15, 2016, Robinson filed a motion in which he requested discovery, permission to supplement and amend his PCRA petition, and an evidentiary hearing on his petition. Therein, Robinson asserted that the complaint filed by the JCB against Eakin revealed numerous additional racially insensitive and otherwise offensive emails (including several making light of domestic violence) that Eakin had sent and/or received, and that even more were entered as exhibits in the proceedings before the CJD. Robinson also identified emails that revealed an association between Eakin and members of the DA's office and between Eakin and Judges Bayley and Masland, respectively, as well as the aforementioned letters sent by Freed and Smith in support of Eakin, all of which were entered at the former Justice's disciplinary proceeding. Robinson contended that he should be entitled to amend his petition to include this information and additional allegations of bias, and claimed his entitlement to an evidentiary hearing on his petition. *See* Pa.R.Crim.P. 905(a) ("The judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time. Amendment shall be freely allowed to achieve substantial justice.").

Further, he stated that his case presented "exceptional circumstances" to warrant the grant of discovery. Pa.R.Crim.P. 902(E)(1). The information disclosed to date, Robinson averred, included the disclosure of "thousands of emails" exchanged between prosecutors, defense attorneys and members of the judiciary, exhibiting "racial, ethnic, gender, class and religious bias," which "creates a grave question about the actual fairness, and appearance of fairness, of the judicial processes in which those parties were involved." Motion, 6/15/2016, ¶ 34. He noted, however, that until now, "investigation has been limited to those emails that remain on the servers of Pennsylvania's Attorney General," and asserts that discovery is required to uncover "the full scope and impact of improper biases on the resolution of [Robinson]'s case." *Id.* He thus requested discovery of the following:

- Any and all electronic messages (including emails and text messages) and attachments exchanged between employees working in the Cumberland County District Attorney's Office or other law enforcement departments and judges of the Cumberland County Court of Common Pleas, Pennsylvania Superior Court and justices on the Pennsylvania Supreme Court from June 1996 to March 15, 2016 that relate to Petitioner or his case, or which may reasonably be deemed offensive because of content that relates to race, gender, ethnicity, violence toward women, xenophobia, homophobia, sexism, religious intolerance, class or immigration or stereotypes relating thereto[;]

- Any and all communications, including but not limited to notes, letters, emails, text messages, attachments and facsimiles exchanged between Cumberland County District Attorney Employees, including District Attorney Freed, and Justice Eakin and/or his attorneys, including, but not limited to Attorneys Williams C. Costopolous, Heidi F. Eakin and David J. Foster[;]

- Any and all communications captured on Cumberland County computer servers, including but not limited to notes, letters, memoranda, writings, records, emails, attachments and

facsimiles exchanged between Cumberland County jurists, specifically Judge Ebert, Judge Bayley and Judge Masland, and Justice Eakin and/or Justice Eakin's attorneys, including, but not limited to, Attorneys William C. Costopolous, Heidi F. Eakin and David J. Foster[;]

- Any and all communications, including but not limited to emails, attachments, notes, text messages, letters, writings, records, memoranda and facsimiles exchanged between Cumberland County jurists relating to Justice Eakin's disciplinary hearing and/or emails involving Justices Eakin or McCaffery;

- Any and all documents previously disclosed to press organizations and/or otherwise made public;

- Any and all electronic communications (including emails and text messages), attachments, communications, writings, memoranda, documents or records, including all associated material on Cumberland County servers that have been sent from and/or sent to Pennsylvania Supreme Court Justice J. Michael Eakin's private email account(s), including but not limited to his yahoo email account: wap092001yahoo.com;

- Any and all emails, attachments, communications, writings, memoranda, documents or records, including all associated material on Cumberland County servers that have been sent from and/or sent to Justice Eakin's state-issued email account: justice.eakin@pacourts.us;

- Any and all emails, attachments, communications, writings, memoranda, documents or records, including all associated material on Cumberland County servers sent from and/or sent to any email account used by Justice Eakin under any aliases, including but not limited to "John Smith"; and

- Any and all material exculpatory evidence arising from these communications for which the prosecution is under a continuing obligation to disclose.  *See Brady v. Maryland* 373 U.S. 83, 87 (1963); *Imbler v. Patchman*, 424 U.S. 409, 427 n.25 (1979).

*Id.*, ¶ 35.

Following argument on June 17, 2016, Judge Herman entered an order for additional briefing on Robinson's motion seeking the DA's disqualification. Both parties complied. In the interim, this Court issued its decision in *Robinson III* affirming the dismissal of Robinson's second PCRA petition as untimely.

In an opinion and order filed on November 28, 2016, the PCRA court denied Robinson's motion to disqualify the DA from the case. The PCRA court stated that removal of a prosecutor from a case is warranted only where there is "an actual conflict of interest affecting the prosecutor," and that mere allegations and animosity are insufficient. PCRA Court Opinion and Order, 11/28/2016, at 3 (Superior Court case citations omitted). Addressing Robinson's claims of bias and possible ex parte communication, the PCRA court found that Robinson made only a "generalized assertion of bias and impropriety" without "any examples of inappropriate ex parte communication between Freed and Justice Eakin." *Id.* at 4.

The PCRA court further found that the Advocate-Witness Rule was inapplicable because "Freed's passive receipt of an email that does not reference or implicate [Robinson] and his penning of a letter of support does not make him a necessary witness to the events referenced in the PCRA petition." *Id.* at 5. Once again, the court found that Robinson's failure to plead specific allegations related to the DA militated against disqualifying the DA from the case. PCRA Court Opinion and Order, 11/28/2016, at 6.

Lastly, the PCRA court found that Robinson's claim that the DA had a personal reputational interest in the outcome of the case lacked support. The court stated that Robinson failed to provide evidence that the outcome of his PCRA petition placed Freed's reputation in jeopardy or that he had any interest in preserving Ebert's reputation. *Id.* at

7. As Robinson did not establish that the DA had an actual conflict of interest, the PCRA court concluded that the DA's disqualification was unwarranted.

Thereafter, the Commonwealth filed a motion to dismiss Robinson's PCRA petition and discovery request without a hearing. This motion was again based on the Commonwealth's assessment of the merits of the case. In support, the Commonwealth pointed to two "email-controversy-based PCRA filings" that common pleas courts had recently dismissed without evidentiary hearings. Commonwealth's Request to Dismiss, 12/8/2016, at 2 (citing *Commonwealth v. Housman*, CP-21-CR-0246-2001, and *Commonwealth v. Shannon*, CP-22-CR-2306-2005)).

Robinson responded, seeking an extension of time to file an answer to the Commonwealth's motion to dismiss and renewing his request for discovery. Robinson also made an another request for permission to amend his PCRA petition, this time based on additional information he received following the completion of the investigation of and report compiled regarding the email scandal by Special Deputy Attorney General Douglas F. Gansler (the "Gansler Report"). On December 28, 2016, the PCRA court granted Robinson's requested time extension. On January 27, 2017, the PCRA court supplemented its order by authorizing "general discovery as requested in [Robinson's] motion of June 15, 2016." Supplemental Order of the PCRA Court, 1/27/2017.

In response, the Commonwealth filed a new motion to dismiss and a request for the PCRA court to vacate and reconsider its grant of discovery, or, in the alternative, to allow the Commonwealth to appeal the grant of discovery. Of relevance to this appeal, for the first time, the Commonwealth asserted in this motion that the PCRA court lacked jurisdiction of the matter on timeliness grounds. The Commonwealth averred that its

review of the Gansler Report revealed newspaper articles detailing Eakin's receipt of at least one racially insensitive email dating back to October 2014, including one published on philly.com, the same online media source that published the October 8, 2015 article relied on by Robinson in his PCRA petition. Commonwealth's Motion to Dismiss, 2/7/2017, ¶ 3 (citing Jeremy Roebuck, *Pa. Supreme Court meltdown over e-mails worsens*, philly.com, Oct. 18, 2014; Kate Giammarise and Bill Toland, *Pennsylvania Justice Eakin dragged into lewd email scandal; accuses McCaffery of blackmail*, Pittsburgh Post-Gazette, Oct. 18, 2014).

In addition to the news articles, the Commonwealth appended a press release authored on October 17, 2014 by Eakin, wherein he acknowledged that he received (but denied that he viewed) emails sent to his personal email address that contained inappropriate content. *Id.* at Exhibit H. Therein, he informed the media that he self-reported this to the JCB for its investigation as to whether his "unsolicited" receipt of these emails violated the canons of judicial conduct. *Id.*

Based on all of this information available in October 2014, the Commonwealth contended that Robinson's November 30, 2015 petition was not filed within sixty days of the date his claimed due process violation could have been presented. *Id.*, ¶ 2; *see* 42 Pa.C.S. § 9545(b)(2). Finding that the Commonwealth "raised a substantial question of fact and law" as to the PCRA court's jurisdiction, the PCRA court ordered Robinson to file an answer to the motion. It further vacated its January 27 order granting discovery, pending the resolution of the jurisdictional question.

Robinson filed a response to the Commonwealth's motion, asserting, in relevant part, that the 2014 articles did not provide a basis for his claim that Eakin's bias violated

his due process rights. Robinson included a generalized timeline of the events leading up to the discovery of Eakin's involvement in the email scandal, averring that it was not until the 2015 articles (and the information that came to light thereafter), which detailed a pattern of sending and receiving offensive emails and connected both Eakin and prosecutors involved in Robinson's case, that his claim could have been made. Thus, by filing his petition on November 30, 2015, Robinson asserted that he met the sixty-day deadline.

The PCRA court held argument on the Commonwealth's motion to dismiss on April 7, 2017. Thereafter, on May 4, 2017, it entered an opinion and order pursuant to Rule of Criminal Procedure 909(B)(2), stating its intent to dismiss Robinson's PCRA petition without a hearing. The PCRA court recognized that Robinson's claims raised in the instant petition "were predicated upon [his] contention that the bias of Justice Eakin was demonstrated both through the sending and receiving of objectionable emails and the potential for inappropriate ex parte communication to have occurred through those emails." PCRA Court Opinion and Order, 5/4/2017, at 6. The court concluded, however, that the petition was not timely filed. In particular, the court found that "Justice Eakin was publicly tied to the email scandal on October 18, 2014, and potentially earlier." *Id.* The court stated that "the public availability of facts," and not "the publication of a specific report on or compilation of those facts," triggers the running of the sixty-day clock for filing a facially untimely PCRA petition. *Id.* at 6-7; *see Commonwealth v. Hackett*, 956 A.2d 978, 984 (Pa. 2008). Further, because counsel represented Robinson at the time, the PCRA court concluded that Robinson was presumed to have been aware of the October 2014 publications, and therefore, that Robinson's November 30, 2015 PCRA petition was

not filed within sixty days of the date the claim could have been raised. *Id.* at 7; *cf. Commonwealth v. Burton*, 158 A.3d 618, 638 (Pa. 2017) (holding that "the public record presumption … cannot reasonably be applied to pro se PCRA petitioners who are incarcerated") (emphasis omitted).

Robinson filed a response to the Rule 909 notice, renewing his request for permission to amend his PCRA petition, an evidentiary hearing, and discovery from the Commonwealth. He attached sixteen exhibits to his filing, divided into two volumes,[14] as

---

[14] The exhibits included:

(1) the December 2015 JCB Complaint;

(2) the Cumberland County judges' letter to the CJD in support of Eakin;

(3) an October 2015 press release issued by the CJD, October 2014 press releases issued by the JCB and Eakin, and Eakin's 2014 letter self-reporting to the JCB;

(4) the 2014 report by Special Counsel Robert L. Byer regarding Eakin's emails;

(5) the JCB's 2014 letter dismissing its investigation of Eakin;

(6) the transcript of the October 20, 2015 deposition of Eakin for the CJD proceedings;

(7) a disc containing all of the offensive emails involving Eakin disclosed thus far;

(8) Eakin's answer to the JCB's 2015 complaint;

(9) the CJD's 2016 opinion;

(10) letters from Freed and Smith in support of Eakin;

(11) the Gansler Report;

(12) a press release issued by Attorney General Bruce Beemer;

(13) the resume and report of Dr. Jason Okonofua regarding implicit bias and bridging Eakin's deposition testimony and involvement in the email scandal with his decision on Robinson's first PCRA appeal;

(14) the report and resume of John Baugh regarding a survey conducted concerning the language used by the prosecution during Robinson's trial;

well as a fifty-seven-page supplement to his third PCRA petition. The Commonwealth filed a response. In an order filed August 2, 2017, the PCRA court denied all of Robinson's requests and dismissed the petition as untimely.

Robinson appealed the dismissal to this Court.[15] Thereafter, in December 2017, Freed left the DA's office and the Cumberland County Board of Judges appointed Ebert to fill the remainder of his term as DA. Ebert now represents the Commonwealth before this Court. On March 1, 2018, counsel for Robinson wrote to Ebert, requesting that he disqualify himself and his office from participating in the matter and to refer the case to the OAG. In a letter dated March 23, 2018, Ebert declined.

On appeal, Robinson raises the following issues for our review:

> I. Did the court below err in concluding, without holding a hearing, that the claims in [Robinson's] successor PCRA petition were untimely pursuant to 42 Pa.C.S. § 9545(b)?
>
> II. Are [Robinson's] claims for relief sufficiently meritorious to require a hearing, necessitating a remand to the court below?
>
> III. Did the court below err in denying [Robinson's] motions to amend the petition?
>
> IV. Did the court below err in denying [Robinson's] motions for discovery and to supplement his discovery request?
>
> V. Did the court below err by denying [Robinson's] motion to disqualify the Cumberland County District Attorney's Office?

(15) the October 30, 2015 report of special counsel Joseph A. Del Sole recommending that the Court refer Eakin to the JCB, but not exercise extraordinary jurisdiction over the matter; and

(16) a May 2017 affidavit by a juror in Robinson's case stating, inter alia, that she believed the prosecution's theme "tapped into jurors' racial prejudice and Black Fear."

[15] We have jurisdiction pursuant to 42 Pa.C.S. § 9546(b).

Robinson's Brief at 1-2.[16]  We review the PCRA court's legal conclusions de novo and its findings of fact for record support.  *Commonwealth v. Stanton*, 184 A.3d 949, 954 (Pa. 2018).

**Timeliness Exception**

In his first issue, Robinson challenges the PCRA court's determination that he failed to satisfy any of the exceptions to the PCRA's timeliness requirement.[17]  Addressing the newly discovered facts exception of section 9545(b)(1)(ii), he asserts that the articles he relied upon, published in October 2015, were "the earliest publicly available source[s] of the facts upon which his claim was predicated."  *Id.* at 18-19.  Accordingly, he argues that his third PCRA petition, filed within sixty days of those publications, overcame the one-year time bar.  Although recognizing that the PCRA court correctly found that the 2014 articles "publicly tied" Eakin to the email scandal, Robinson states that these articles did not contain the facts upon which his claim is predicated, i.e., that Eakin sent and received offensive emails and communicated ex parte with prosecutors.  *Id.* at 20.  To the contrary, Robinson states that the 2014 publications about Eakin's involvement in the email scandal all reported that he denied asking for or even opening the offending messages, and did not indicate that he sent any offensive emails to anyone.  Robinson

---

[16]  On April 17, 2018, Robinson filed an additional motion before this Court to disqualify the DA from further proceedings based on Ebert's resumption of the position of DA.  We address this motion in conjunction with our resolution of his claim of PCRA court error for denying the same request.

[17]  The PCRA court's discussion of this issue in its opinion filed pursuant to Pa.R.A.P. 1925(a) mirrors, in pertinent part, its discussion of this claim addressed in its May 4, 2017 opinion and order.  *Compare* PCRA Court Opinion, 10/23/2017, at 5-7, *with* PCRA Court Opinion and Order, 5/4/2017, at 4-7.

also points to numerous investigations that the 2014 publications generated – including those conducted by the JCB and this Court – all of which had cleared Eakin of any wrongdoing.

Moreover, Robinson contends that the content and volume of the emails (three) discussed in the 2014 publications did not give rise to a claim of bias on the part of Eakin or connect prosecutors involved in Robinson's case to the scandal. Robinson argues that these are the facts that form the basis of his claim, and he asserts that this information was not known until publication of the October 2015 articles. *Id.*

The Commonwealth responds, contending that Robinson's claim fails based on the absence of a connection between the newly discovered fact and the underlying substantive issue raised. Commonwealth's Brief at 14. In support of this argument, the Commonwealth points to our recent decision in *Commonwealth v. Chmiel*, 173 A.3d 617 (Pa. 2017), stating: "[T]he majority of our Supreme Court believes that while we need not find a 'direct connection' between the newly-discovered facts and the claims asserted by a petitioner, the statutory language requires there be some relationship between the two." Commonwealth's Brief at 13 (citing *Chmiel*, 173 A.3d at 624-25).[18] The Commonwealth suggests that the newly discovered facts alleged here are too "attenuated" from the underlying claim to merit review. *Id.* at 15. It states that because the offensive emails exchanged by Eakin occurred "over a decade after [Robinson's] trial and several years after his 2005 initial PCRA case concluded," and there is no connection between the

---

[18] The Commonwealth incorrectly purports to quote this sentence from our decision in *Chmiel*. *See* Commonwealth's Brief at 13. Rather, this statement is a quote from the Superior Court's decision in *Commonwealth v. Shannon*, 184 A.3d 1010 (Pa. Super. 2018). *See id.* at 1017.

emails and either Robinson personally or his case, "the claims on their face are meritless and remand is not warranted." *Id.* at 17.

The Commonwealth also assails Robinson's claim that the information regarding Eakin's involvement in the email scandal were unknown to him in 2014, pointing to Eakin's 2014 press release and the news articles published at that time. *Id.* at 17, 23-28. It contends, "The 'fact' [Robinson] champions as 'new' was easily decipherable from these public sources in 2014." *Id.* at 28. As to Robinson's claim of ex parte communications between the Commonwealth and Eakin, the Commonwealth states that this cannot constitute a new fact, as Robinson as failed to provide any instances of such communications. *Id.* at 20.

A PCRA petition is facially untimely, and a court lacks jurisdiction to decide the claims raised therein, if filed more than a year after the petitioner's judgment of sentence becomes final. 42 Pa.C.S. § 9545(b)(1); *Commonwealth v. Mitchell*, 141 A.3d 1277, 1284 (Pa. 2016). One exception to this general rule, often referred to as the "newly discovered facts" exception, bestows jurisdiction upon a court to decide a facially untimely petition if "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." 42 Pa.C.S. § 9545(b)(1)(ii). Any petition asserting the newly discovered facts exception must be filed within sixty days of the date the claim could have been raised. 42 Pa.C.S. § 9545(b)(2).

As the PCRA court observed, an incarcerated petitioner represented by counsel at the time that information becomes publicly available is subject to the "public record presumption." *See, cf.*, *Burton*, 158 A.3d at 638. As we have previously held, the "public record presumption" generally requires a court to find that facts and information that are

a matter of public record are not unknown. *Commonwealth v. Taylor*, 67 A.3d 1245, 1248 (Pa. 2013). In a similar vein, we have held that facts used to overcome the timeliness requirement of the PCRA must not merely be from "a newly discovered or newly willing source for previously known facts." *Commonwealth v. Edmiston*, 65 A.3d 339, 352 (Pa. 2013). Robinson was indeed represented by counsel in October 2014, which was during the pendency of his second PCRA petition and his federal habeas petition. *See supra*, p. 7. Therefore, if the information publicly available in 2014 provided Robinson with information such that, with the exercise of due diligence, he could have discovered the facts underlying his claim, the 2015 articles do not save his third PCRA petition from dismissal on timeliness grounds.

Our review of the news articles, press releases, and other information included in the record in this matter from 2014 reveals that they all state that at that time, Eakin had received three emails – two that were sexist and misogynistic and one that was racially insensitive. According to all of the publicly available sources of record, however, Eakin categorically denied that he either welcomed these emails or that he opened them to view their contents. *See, e.g.,* Roebuck, *Pa. Supreme Court meltdown over e-mails worsens*, philly.com;[19] Charles Thompson, *Colleague says Pa. Supreme Court Justice in porn*

---

[19] The Commonwealth misrepresents the contents of the October 2014 philly.com article, stating that it "definitively says the former justice 'opened' a 'racist' email on his private account." *See* Commonwealth's Brief at 25 n.12. In fact, the portion of the article that the Commonwealth quotes only states that Eakin "opened" an email account using the pseudonym "John Smith." Roebuck, *Pa. Supreme Court meltdown over e-mails worsens*, philly.com ("The messages - first reported by the Philadelphia Daily News - include at least three e-mails sent in 2010 to a Yahoo.com account Eakin had opened under the alias 'John Smith.'"). In a separate section, the article uses the term "racist" to describe the content of an email alleged to have been received by Eakin, but that Eakin denied that he opened that message. *Id.* ("Responding to reports that he had received racist and

*email case threatened he was: "not going down alone"*, pennlive.com, Oct. 17, 2014. *See also* J. Michael Eakin, Press Release, Oct. 17, 2014 ("I have not seen the material, nor do I wish to"); J. Michael Eakin, Letter to the JCB, Oct. 17, 2014 ("To be clear, I still have not seen [the emails]. I have no reason to question the media's description of them, and that these were received, not sent."). In its disciplinary decision, the CJD found that unless Eakin responded to or forwarded an email, there was no way to refute Eakin's claim that he did not open them. *See In re Eakin*, 150 A.3d 1042, 1045-46 (Pa. Ct. Jud. Disc. 2016).

To the extent we could conclude that the uninvited receipt of three offensive emails put Robinson on notice in 2014 that Eakin may have been biased in his decision making, such a notion was put to rest by the various investigations conducted of the then-available emails Eakin sent and received. On October 15, 2014, a news outlet reported that former Chief Justice Castille stated that he reviewed 4000 emails that had been exchanged between the sitting Justices of the Pennsylvania Supreme Court and the OAG and "exonerate[d]" all Justices other than McCaffery of sending or receiving offensive emails. Bumsted, *Castille: No Justices Except McCaffery Involved in Porn Scandal*, Pittsburgh Tribune-Review.

On December 17, 2014, the JCB concluded its investigation of claims that Eakin received "racy" emails at his personal "John Smith" email account. *See* JCB Letter, 12/17/2014, at 2. The JCB conducted three interviews with Eakin and reviewed subpoenaed emails ranging from 2009-2012 from the OAG. The JCB determined that

pornographic content on a private e-mail account, Justice J. Michael Eakin said he never viewed those messages and accused another colleague caught up in the scandal, Justice Seamus P. McCaffery, of threatening to leak them to the media.").

Eakin "did not receive any material that was illegal, such as obscenity, or any material that contained 'racist' images," and that although Eakin received some emails with "pornographic" content to his "John Smith" account, he did not send any such emails. *Id.* at 3. The JCB found no improper communications in the emails submitted by the OAG to or from his Court-issued email address. *Id.* The JCB concluded that Eakin's "receipt of a handful of mildly pornographic emails from a private attorney and from members of [his] personal circle of friends to [his] personal email address did not constitute a violation of the Constitution or the Code of Judicial Conduct," and dismissed the pending complaints. *Id.* at 4.

This conclusion was echoed in the December 19, 2014 report completed by Attorney Robert L. Byer, who was specially engaged by this Court to review email messages recovered by the OAG involving Justices of the Pennsylvania Supreme Court (hereinafter referred to as the "Byer Report"). Of relevance to the matter at bar, he concluded:

> 1. Other than the previously disclosed email messages from [McCaffery] transmitting pornographic materials, there were **no email messages of an improper nature sent by any Justice of the Supreme Court** to any representative of OAG **or from any representative of OAG to any Justice of the Supreme Court**.
>
>       \*   \*   \*
>
> 3. There was no reason for any Justice of the Supreme Court to be recused from any case as the result of any email communication or any relationship evidenced by email communication.

Byer Report at 1 (emphasis added). Attorney Byer detailed his review of emails provided to him from the OAG's server pertaining to each Justice. Regarding Eakin, he reviewed

a total of 2234 emails that members of the OAG either sent to or received from Eakin, all of which Attorney Byer found to be "unremarkable." *Id.* at 4.

In conducting his review, Attorney Byer observed "a critical distinction between email messages sent from an account and email messages sent to an account," as a person does not have "control over what others send." *Id.* at 5. He noted that "there was one message received by Eakin that contained offensive sexual content," but stated that the "message was not from someone at OAG or associated with the judicial system, and Justice Eakin did not reply to or forward that message." *Id.* Attorney Byer found no messages discussing any cases or legal issues. *Id.* at 4.

Based on the information publicly available in 2014, we conclude that Robinson did not have a basis to allege that Eakin was biased in order to bring his due process claim at that time. As is evident from the investigations undertaken by this Court and the JCB, both of which requested all email communications (sent and received) between Eakin and members of the OAG, no amount of diligence could have uncovered the facts upon which Robinson's claim is predicated, i.e., that Eakin sent and received offensive emails. *See, e.g.,* JCB Complaint, 12/8/2015, ¶ 50 ("Despite the Board's prior subpoenas, OAG did not inform the Board of its possession of any emails from Justice Eakin's 'John Smith' email address beyond the 48 Outlook files received by the Board on November 5, 2014, and did not provide them to the Board until September 28, 2015.").

That all changed, however, in 2015, when news outlets revealed additional offensive emails that Eakin had not only received from various sources, but also had sent, in contradiction to his 2014 claim that he had never opened or welcomed these emails. On October 8, 2015, a report disclosed the existence of additional emails, which

contained descriptions of racist, sexist, homophobic and misogynistic content, and which indicated that Eakin both received and sent these emails. These emails, sent to the media by the OAG, were also sent directly to the JCB by the OAG on discs on September 28, 2015 (but were not made public at that time) and October 15, 2015, and the JCB's complaint confirmed that the emails had not previously been disclosed. *Id.*, ¶ 67 ("Based on their review, Board staff concluded that the September 28, 2015 disc [sent by the OAG] contained emails that had not been seen by any Board staff member during the 2014 investigation of Justice Eakin.").

We considered analogous circumstances when deciding *Commonwealth v. Chmiel*. In that case, we held that the FBI's public acknowledgement (in the form of a press release that was published in several newspapers) that testimony regarding microscopic hair analysis was "flawed" in the great majority of cases constituted a "new fact" for PCRA purposes. *Chmiel*, 173 A.3d at 626. In so holding, we rejected the contention that earlier reports and articles that indicated that the FBI was questioning the validity of its methodology, or scientific studies challenging the reliability of the principles of hair analysis, rendered the press release "simply a confirmation of information that was already available in the public domain." *Id.* at 625. Instead, we held that the facts contained in the press release, including (1) the FBI's public admission about the flawed nature of its analysists' testimony and statements about microscopic hair comparison analysis and (2) the FBI's statement that it had trained state and local analysists to give the same flawed testimony in state criminal proceedings, were new. We thus found that the publication of the press release triggered the sixty-day window for the petitioner to file his claim concerning the microscopic hair comparison analysis testimony provided at his

own criminal trial.  *Id.* at 626.  "Although the scientific foundation of such conclusory assertions was called into question beginning as early as 1974, and continually thereafter, this substantial shift in understanding was not embraced or acknowledged by the FBI until it went public with the preliminary results of its independent review."  *Id.* at 27 (internal citation omitted).

As in *Chmiel*, although there was some publicly available information about Eakin's involvement in the email scandal in 2014, those news articles did not contain the facts upon which the claim raised in Robinson's third PCRA petition is predicated.  Those facts were not knowable or made public until October 8, 2015, when the information concerning Eakin's sending and receiving of offensive emails became publicly available.  This places Robinson's November 30, 2015 petition squarely within sixty days of that date.  *See* 42 Pa.C.S. § 9545(b)(2).  Not until the release of these newly disclosed emails did the "fact" of Eakin's active participation in the transmission of offensive emails become known.  Indeed, the disclosure of these new emails prompted the JCB to open a new ethics investigation against Eakin, which resulted in the JCB filing a complaint against him, disclosing numerous additional offensive emails both sent and received by Eakin.  *See* JCB Complaint, 12/8/2015, ¶¶ 78, 80-81 (detailing the emails disclosed in 2015); *id.*, ¶¶ 96, 99, 100 (alleging that Eakin's transmission and receipt of sexist, racist, homophonic, and religiously and ethnically insensitive emails constituted violations of the Pennsylvania Constitution and Canons of Judicial Conduct).  The CJD ultimately sanctioned Eakin for

these violations based on his exchange of these emails.  *See In re Eakin*, 150 A.3d at 1061.[20]

The Commonwealth does not raise a claim regarding the overarching relationship between the facts and the claim (i.e., the emails reflect bias against people of color and those affected by domestic abuse).  Rather, it argues that the emails postdate Eakin's participation in Robinson's first PCRA appeal and that the emails do not mention his case (or any case) in particular, rendering Robinson's underlying due process claim meritless.  This argument implicates the merits of the claim raised, not the timeliness of the petition.

---

[20] The CJD did not make a finding of whether Eakin's behavior reflected bias in his judicial decisions.  It noted only that the JCB did not present any evidence that Eakin demonstrated bias in his written opinions and that Eakin presented witnesses to contest any such claim.  *In re Eakin*, 150 A.3d at 1048, 1060.  It observed, however, that Eakin's exchange of these emails "could cause citizens to wonder whether their cases received unbiased consideration by [him]."  *Id.* at 1058.

Justice Dougherty's Opinion in Support of Affirmance ("OISA") misleadingly transforms the CJD's statement that the JCB did not present evidence that Eakin's writings demonstrated bias into a finding of fact of some importance.  *See* OISA (Dougherty, J.) at 2 & n.2 (remarking upon the CJD's statement that the JCB failed to present this evidence and criticizing "the [Opinion in Support of Reversal's] minimization of this important aspect of the CJD's ruling"); *id.* at 5 (stating that the CJD "determined there was no evidence of bias").  Contrary to the OISA, the CJD did not find that there was no evidence of bias in Eakin's decisions, but simply that the JCB did not present any such evidence in the disciplinary proceeding.  There are myriad reasons why the JCB may have opted not to present evidence of bias in Eakin's writings, including, most notably, the fact that Eakin resigned from service as a Justice of this Court prior to the disciplinary proceedings, rendering any findings related to his writings irrelevant and unnecessary to the question of the consequences for his behavior.  The CJD certainly did not make a finding of fact that Eakin's writings did not reflect bias, instead finding it to be "significant[]" that the emails could suggest Eakin's bias in his consideration of the cases before him, which the CJD found "abhorrent to the principles to which [Eakin] has ostensibly dedicated his entire professional career."  *In re Eakin*, 150 A.3d at 1058.  It further observed, "A reasonable inference that [Eakin] lacked the impartiality required of judges also fundamentally lessens public confidence in the judiciary."  *Id.*  The question of whether the bigoted emails sent and received by Eakin reflect bias in his decision making remains an open question that should be decided by Pennsylvania courts.

Indeed, as stated hereinabove, the Commonwealth argues that the absence of a connection between the emails and Robinson's case renders the claims raised in his petition to be facially "meritless." Commonwealth's Brief at 17. "Whether a petitioner has carried his burden [of proving an exception to the PCRA's timeliness requirement] is a threshold inquiry that must be resolved prior to considering the merits of any claim." *Robinson III*, 139 A.3d at 186. The only elements required for the newly discovered facts exception to apply are that (1) the facts upon which the claim is predicated were unknown and (2) these facts could not have been discovered by the exercise of due diligence. 42 Pa.C.S. § 9545(b)(1)(ii); *Commonwealth v. Bennett*, 930 A.2d 1264 1272 (Pa. 2007)). We therefore find the Commonwealth's argument to be premature at this stage of the case.

In reaching a contrary conclusion, Justice Dougherty in his Opinion in Support of Affirmance ("OISA") overlooks not only the Commonwealth's concession that a nexus between the emails and Robinson's case implicates the merits of the claim, but also this Court's longstanding interpretation of the newly discovered fact exception as requiring only the establishment of the two elements, described above. The OISA contends that racist, sexist and misogynistic emails cannot serve as facts upon which a due process violation can be predicated because the emails that have been disclosed thus far do not specifically mention Robinson or his case. *See* OISA (Dougherty, J.) at 1-2. The notion that Robinson was required to establish an individualized case reference in order to

establish a claim of bias under these circumstances is not only myopic, it is dangerous, and could serve to eviscerate the newly discovered fact exception.[21]

The fundamental flaw in the OISA's approach is revealed in its conclusion that Robinson fails to meet the newly discovered fact exception because the "mere existence [of the emails] does not demonstrate the fact of bias." *See* OISA (Dougherty, J.) at 5 (quoting *Commonwealth v. Blakeney*, 193 A.3d 350, 369 (Pa. 2018) (Dougherty, J., Opinion in Support of Affirmance)). The newly discovered "fact" here is the email communications by Eakin, not the existence of bias. According to Robinson, the emails reflect Eakin's bias; i.e., the claim (Eakin's bias in his decision making) is predicated on a newly discovered fact (the bigoted emails sent and received by Eakin). The OISA would require Robinson to demonstrate that Eakin was biased in his decision making in order to overcome the timeliness hurdle, but Eakin's bias is the underlying claim that Robinson has brought in the instant PCRA petition – Robinson asserts that a biased Court reviewed the resolution of his first PCRA petition, violating his right to due process. As stated hereinabove, and repeatedly throughout this Court's precedent, "the [timeliness] exception set forth in subsection (b)(1)(ii) does not require any merits analysis of the underlying claim. Rather, 'the exception merely requires that the 'facts' upon which such a claim is predicated must not have been known to appellant, nor could they have been

---

[21] Moreover, the OISA ignores that Robinson requested discovery, which, if permitted, would allow him to obtain emails from other sources and timeframes that might enable him to make the precise connection between the emails and his case that the OISA somehow believes to be necessary at this stage of the proceeding. The OISA also disregards that in his request to amend his PCRA petition, Robinson offered expert witnesses who, again, could potentially provide the connection between Robinson's case and the bigoted emails sent and received by Eakin that the OISA criticizes him for omitting.

ascertained by due diligence.'" *Bennett*, 930 A.2d at 1271-72 (quoting *Commonwealth v. Lambert,* 884 A.2d 848, 852 (Pa. 2005)). In short, based on the record in this case and the precedent that binds this Court, the OISA's view is wholly unsupportable.

As the PCRA court correctly found, Eakin's transmission and receipt of offensive emails were the facts upon which Robinson's claimed due process violation was predicated, as Robinson contends that the exchange of these emails reflects Eakin's bias. PCRA Court Opinion, 10/23/2017, at 7. Its conclusion that these facts were ascertainable in October 2014, however, finds no record support. *See id.* As discussed herein, the facts underlying Robinson's claim could not have been discovered through the exercise of due diligence until October 8, 2015. As Robinson satisfies the newly discovered fact exception to the PCRA's time bar, we would vacate the PCRA court's decision dismissing Robinson's third PCRA petition on timeliness grounds.

### Amendment to Petition and Evidentiary Hearing

Robinson next asks us to consider whether the PCRA court erred by failing to permit him to amend his third PCRA petition and by denying his request for an evidentiary hearing. Our review of the PCRA court's decision reveals that it denied both requests based solely on its conclusion that the petition was untimely. *See* PCRA Court Opinion, 10/23/20117, at 8, 11. In fact, the PCRA court stated that although it disallowed his request to amend his petition, it reviewed Robinson's proposed amended petition "for the purpose of determining if [the proposed amendments] might somehow cure [Robinson's] lack of timeliness in filing and grant jurisdiction to the [c]ourt." *Id.* at 10.

A PCRA petitioner must seek permission from the PCRA court to amend, and such requests are to be "freely allowed to achieve substantial justice," "at any time."

Pa.R.Crim.P. 905(A). *See also Commonwealth v. Williams*, 828 A.2d 981, 998 (Pa. 2003) ("the Rules demand liberal amendment of a PCRA petition"). Similarly, a PCRA court is required to hold an evidentiary hearing if it finds the petitioner raised any material issues of fact. Pa.R.Crim.P. 908(A)(2). Because the PCRA court found that it was without jurisdiction to reach the merits of the issues raised in Robinson's third PCRA petition, we do not fault the PCRA court for denying his requests on that basis. *See Commonwealth v. Marshall*, 947 A.2d 714, 723 (Pa. 2008) (finding no error in the PCRA court's refusal to hold an evidentiary hearing for an untimely PCRA petition to which no exceptions applied); *Commonwealth v. Sepulveda*, 144 A.3d 1270, 1278 (Pa. 2016) (stating that courts should allow amendment pursuant to Rule 905(A) to allow a petitioner "to avoid dismissal due to a correctable defect in claim pleading or presentation").

Because we would have found that the PCRA court has jurisdiction to decide the merits of Robinson's petition, on remand we would have ordered the PCRA court to reconsider its decision on Robinson's requests to amend his petition and for a hearing. *Cf., Commonwealth v. Stokes*, 959 A.2d 306 (Pa. 2008) (stating that an analysis of the merits of the claims raised in a PCRA petition "is separate and distinct from" a consideration of the timeliness of the petition).

## Discovery

We next consider whether the PCRA court erred by denying Robinson's request for discovery. In its Rule 1925(a) opinion, the PCRA court indicated that even if Robinson had timely filed his petition, Robinson was not entitled to discovery because he did not make "a showing of 'exceptional circumstances'" to support his request. PCRA Court Opinion, 10/23/2017, at 11-12; *see* Pa.R.Crim.P. 902(E)(1). Specifically, it found that he

failed to adduce any proof that the exchange of offensive emails by Justice Eakin occurred "during the time of his conviction and appeal or that it affected his case in any way." PCRA Court Opinion, 10/23/2017, at 14. Further, the PCRA court faulted Robinson for "cast[ing] a wide net" in his discovery request, referring to it as "generic, all-encompassing," and "a forbidden fishing expedition." *Id.*

These additional, non-jurisdictional bases for denying discovery are highly questionable. As stated hereinabove, the record reflects that the PCRA court, in fact, initially granted Robinson's June 15, 2016 discovery request. PCRA Court Order, 1/27/2017. It was not until the Commonwealth argued, and the PCRA court agreed, that the instant petition did not satisfy an exception to the PCRA's timeliness requirements that the court decided that Robinson was not entitled to discovery in this matter. We note that at least some of the information sought may be solely within the possession of the DA. However, the DA's arguments against the grant of discovery, and one of the PCRA court's alternative basis for denying Robinson's request, are based on Robinson's failure to present evidence in support of his claim. We further observe that there has been no fact finding conducted regarding the scope and breadth of this email scandal. The CJD did not conduct a full trial in Eakin's disciplinary matter (it adjudicated the case on stipulated facts) and the Disciplinary Board of the Pennsylvania Supreme Court has not reported any action taken against any of the attorney senders and receivers of these emails. The only emails sent or received by Eakin that have been disclosed to date are those that were housed on the OAG's server.

Nonetheless, as the issue of discovery implicates the merits of the claims raised, and because we would remand the case for the PCRA court to review the merits of his

pending PCRA petition, we think it would have been prudent to allow the PCRA court to reconsider this issue as well. This would have allowed Robinson to file an amended request for discovery, modifying his request (if he deems it necessary) to address the concerns raised in the PCRA court's 1925(a) opinion. *See* Robinson's Brief at 58 ("To the extent, however, that the lower court thought the request was overly broad, it could have granted the discovery request only in part or directed Mr. Robinson to tailor a more narrow request.").

## Disqualification of the DA from Further Proceedings

In his final issue on appeal, Robinson asserts that the PCRA court erred by denying his request to disqualify the DA from participating in further proceedings in this case. The PCRA court found that Robinson failed to establish that there were any ex parte communications between Eakin and the DA (or any members of the DA's office) or that an actual conflict of interest existed precluding the DA from representing the Commonwealth in this matter. It therefore found that he was not entitled to the appointment of a new prosecutor.

Robinson contends that this finding was erroneous. In his brief before this Court, he states that the receipt by both Freed and Ebert of Eakin's emails "potentially reflects on their reputations individually and on the reputation of the District Attorney's office" and "potentially colors their assessment of the offensiveness of the emails" and the impact they had on the appellate review of Robinson's case. Robinson's Brief at 61. Further, Robinson states that bias is established based on the letters sent to the CJD from Freed and Smith, both of whom indicated their close relationship with Eakin and expressed their personal opinions about the central issue involved in this case, i.e., whether Eakin

exhibited bias in his judicial decisions. *Id.* at 61-62. He contends that they both have "personal stakes" in the claims raised in his PCRA petition "in ensuring that their longstanding friend suffered no consequences for his conduct." *Id.* at 62

In his motion before this Court, he asserts that Ebert's resumption of his role as DA continues to require the disqualification of that office in this matter. He observes that, as a judge, Ebert was a signatory to a letter sent to the CJD in support of Eakin, wherein he "candidly acknowledges the close personal ties" between the two. Robinson's Motion to Disqualify the DA's Office, 4/17/2018, ¶¶ 5, 7. This letter resulted in Judge Guido recusing the entire Cumberland County bench from deciding Robinson's PCRA petition based on "the appearance of a conflict of interest or impropriety," a finding that Robinson asserts necessarily should carry over to Ebert's decision making as the prosecutor in this matter. *Id.*, ¶¶ 6, 7. Further, Robinson states that the now-publicly available emails reveal Ebert to have been "a recipient of roughly twenty … 'blast' emails that Justice Eakin also received, including a few that contained objectionable content." *Id.*, ¶ 9. Robinson states that this information regarding Ebert reveals his personal interest in defending against the claims raised in Robinson's PCRA petition, as he would want to "minimize the significance of the emails" for his personal reputation and that of Eakin, his close friend, and "impairs [his] independent judgment as a prosecutor." *Id.*, ¶¶ 13-14. He asserts that Ebert's conflict, when combined with the aforementioned information regarding Freed and Smith and their relationships with Eakin, compounds the reputational concerns of the DA as an office. *Id.*, ¶ 11. According to Robinson, the continued participation of that office in his case "threatens the fundamental fairness of these proceedings, and violates [his] right to due process of law." *Id.,* ¶ 17.

In response, the Commonwealth contends that because this case is on appeal, any prejudice arising from the alleged conflict the DA has "is far less" as "the prosecution has far less discretion" at the appellate stage. Commonwealth's Response to Motion to Disqualify, 5/2/2018, at 1 (quoting *Commonwealth v. Harris*, 460 A.2d 747, 750 (Pa. 1983) (plurality)). The Commonwealth asserts that Robinson was required to prove "an actual impropriety, which taints the proceedings," and that he has failed to satisfy this burden. *Id.* at 2 (quoting *Commonwealth v. Breakiron*, 729 A.2d 1088, 1092 (Pa. 1999)). It states that Robinson "has not presented anything demonstrating bias in the opinions or proceedings of his case," and that the disqualification of the DA in this matter – which it contends is an "untimely, previously-litigated, and meritless serial PCRA petition" – is unsupported by Pennsylvania precedent and would be "a great disservice to the citizens of this Commonwealth." *Id.* at 3.

A criminal prosecutor serves in a capacity unique from that of a traditional lawyer, as "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Pa.R.P.C. 3.8, Comment [1]. *See also Berger v. United States*, 295 U.S. 78, 88 (1935) (describing the role of the prosecutor as "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done").

A prosecutor's duty to act as a minister of justice does not end when a conviction is obtained. This role, and the responsibilities attendant to it, extend into the appellate and collateral stages of a criminal case. *See, e.g., Commonwealth v. Williams*, 86 A.3d 771, 788 (Pa. 2014) (prosecutors have "an affirmative and continuing duty" under *Brady*

*v. Maryland*[22] to disclose exculpatory information to a criminal defendant). *See also Chmiel*, 173 A.3d at 631 (Donohue, J., concurring) (stating that the prosecutor, as a minister of justice, had an ethical obligation, outside of the discovery process, to provide information that was solely within its possession to the defendant at the collateral stage of the proceeding).

A district attorney is not only subject to the Rules of Professional Conduct, which govern attorneys, but also to "the canons of ethics as applied to judges in the courts of common pleas of this Commonwealth insofar as such canons apply to … conflict of interest." 16 P.S. § 1401(o).[23] The Rules of Professional Conduct provide that a lawyer has a conflict of interest that prohibits the lawyer from representing a client in a matter if, inter alia, "there is a significant risk that the representation … will be materially limited … by a personal interest of the lawyer." Pa.R.P.C. 1.7(a)(2). Canon 2 of the Code of Judicial Conduct requires, in relevant part, that a judge "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Pa.C.J.C. Rule 2.11(A); *see also id.,* Comment [2] ("A judge's obligation not to hear or decide matters in which disqualification is required applies regardless of whether a motion to disqualify is filed."). Further, Canon 1 provides that a judge must "avoid impropriety and the appearance of impropriety." Pa.C.J.C. Rule 1.2.

---

[22] *Brady* held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[23] Act of Aug. 9, 1955, P.L. 323, § 1401, as amended.

Our prior precedent on the disqualification of a prosecutor because of an alleged conflict of interest generally proceeds along two lines. The first, relied upon by the Commonwealth, involves cases in which the actions of a prosecutor constitute an "actual impropriety" of sufficient severity to have tainted the proceedings and thus prejudiced the defendant. *See, e.g., Breakiron*, 729 A.2d 1088; *Harris*, 460 A.2d 747. The second, relied upon by Robinson (and the PCRA court), involves cases in which the prosecutor has an actual conflict of interest that threatens his or her independent judgment in fairly prosecuting the case in accordance with professional standards. *See, e.g., Commonwealth v. Briggs*, 12 A.3d 291 (Pa. 2011); *Eskridge*, 604 A.2d 700; *see also Commonwealth v. Jermyn*, 709 A.2d 849 (Pa. 1998).

The first line of cases, which typically involve circumstances where defense counsel becomes the district attorney during the pendency of the case, originates with a two-Justice[24] plurality decision in *Harris.* In *Harris*, during the pendency of Harris' first collateral appeal, the attorney appointed to represent him was appointed to serve as district attorney. Former counsel, now district attorney, assigned his first assistant to represent the Commonwealth in Harris' matter, as well as any other cases in which he was involved as a defense attorney. *Id.* at 748-49.

Harris subsequently filed a second petition for collateral review alleging, inter alia, ineffectiveness of his former counsel based on his appointment as district attorney, and asserting his right to withdraw his guilty plea on that basis. This Court unanimously agreed that Harris was not entitled to relief, but disagreed as to the reasoning. Justices Zappala and Larsen stated that the "appearance of impropriety" standard advocated by

---

[24] Justice Zappala authored the plurality opinion, which Justice Larsen joined.

Harris was "not viable" because "it would allow a defendant to have his case dismissed any time a special prosecutor was not appointed to his case when a member of the public defender's staff has been appointed to the staff of the [d]istrict [a]ttorney during the pendency of the defendant's post-trial proceedings." *Id.* at 749. Instead, these Justices found that the question should require the application of "a more objective and flexible standard," on a case-by-case basis, to determine "whether the acts of a public prosecutor have actually tainted the proceedings so as to require a new trial with a special prosecutor appointed." *Id.* As such, they indicated that in situations where defense counsel switched to prosecutor during the course of criminal proceedings, they would require "that a defendant show an **actual impropriety** in order to establish the requisite prejudice to a defendant."[25] *Id.* (emphasis added).

Justices Zappala and Larsen made clear that their decision was influenced in part by the procedural posture of the case when the switch occurred, i.e., at the appellate stage of the proceeding. They observed that counsel "was not privy to any confidences which may have been devulged [sic] during the pre-trial and trial stages," and "the resolution of the case rested upon arguments and conclusions of law which would be of no value to him when he became [d]istrict [a]ttorney." *Id.* at 750. "The danger of prejudice

---

[25] Although not employing the "actual impropriety" language, in a case decided just two days before *Harris*, this Court identified a circumstance in which the prosecutor's actions resulted in prejudice to the defendant and thus required a new trial. In *Commonwealth v. Lowery*, 460 A.2d 720 (Pa. 1983) (per curiam), the attorney who had represented the defendant on a suppression matter in the trial court had become the district attorney at the time of appeal. *Id.* at 720. On appeal, he instructed his office to attack the adequacy of his own defense on the suppression issue. *Id.* In requiring a new trial, the Court indicated that an attack by an attorney on his own work is a "direct attack on the adversary system which undermines the total trust and confidence between an attorney and his client necessary to its functioning … [since] all individuals must be assured that their lawyer can never assert his own failures against them." *Id.* at 721.

is far less when prosecutorial conflict arises during appellate proceedings. At this stage, the prosecution has far less discretion; its role is to answer arguments made by the defendant." *Id.* (quoting *Pisa v. Commonwealth*, 393 N.E.2d 386, 390 (Mass. 1979)).

The remainder of the Court concurred only in the result reached by the two-Justice plurality. Chief Justice Roberts disagreed that the "appearance of impropriety" standard was not applicable, but concluded that there was no demonstrated impropriety, "actual or apparent," that would entitle Harris to the relief he sought (i.e., to withdraw his guilty plea). *Id.* at 750 (Roberts, C.J., concurring). Notably, Chief Justice Roberts stated that Harris would "at best … be entitled to the disqualification of the District Attorney of Lehigh County on the present appeal from the denial of post-conviction relief," but because that was not the relief he sought, he declined to discuss further this avenue of relief. *Id.* at 751.

Justice Hutchinson, joined by Justice Flaherty, found that "[n]o conflict of any kind exist[ed]," but likewise disagreed with the plurality's decision to reject the "appearance of impropriety" standard. *Id.* at 751 (Hutchinson, J., concurring) ("I also believe we should not imply or even hint that the appearance of impropriety is generally excusable."). Justices Nix and McDermott concurred in the result without authoring separate opinions.

In *Breakiron*, the OAG assumed prosecutorial responsibility at the PCRA stage at the request of the district attorney because Breakiron's trial and direct appeal counsel (both former public defenders) became members of the district attorney's office. Shortly thereafter, Breakiron sought the removal of the OAG and the appointment of a special prosecutor because the OAG allegedly asked Breakiron's trial counsel to review a file that remained in the public defender's office and to review PCRA filings before filing them in court. *Breakiron*, 729 A.2d at 1092. This Court agreed with the PCRA court that removal

of the OAG from the case was unnecessary, as any prejudice suffered by the OAG's actions was de minimis. Further, and without discussion or recognition of *Harris*' lack of precedential value, the Court applied the *Harris* plurality's "actual impropriety standard." *Id.* ("Breakiron did not meet his burden of proof in showing that there was any actual impropriety in Attorney Graci's conduct.") (citing *Harris*).[26] Accordingly, the Court ruled that Breakiron was not entitled to the removal of the prosecutor. *Id.*

The second line of precedent in this area, which does not require a showing of an "actual impropriety," involves prosecutors who have a personal interest in the outcome of the case. *See, e.g., Briggs*, 12 A.3d at 330-31; *Eskridge*, 604 A.2d at 701. In *Eskridge*, the district attorney's private law firm was engaged to represent the victims of a car accident, which also resulted in the filing of criminal charges against Eskridge. We found that this constituted an impermissible conflict of interest that preluded any members of the district attorney's office from prosecuting the defendant. In so concluding, the Court observed that a prosecutor could not proceed in a criminal matter if his professional judgment may be affected by extraneous considerations. "A defendant does not have a right not to be prosecuted; he does, however, have a right to have his case reviewed by an administrator of justice with his mind on the public purpose, not by an advocate whose judgment may be blurred by subjective reasons." *Eskridge*, 604 A.2d at 701 (quoting *Commonwealth v. Dunlap*, 355 A.2d 364, 368 (Pa. Super. 1975) (Hoffman, J.,

---

[26] The holding in *Breakiron,* requiring proof of an "actual impropriety" and not the appearance of impropriety for the disqualification of a prosecutor, arguably conflicts with the Canon 1 of the Code of Judicial Conduct and the statute making the canons applicable to prosecutors. *See* 16 P.S. § 1401(o); Pa.C.J.C. 1.2.; *supra*, p. 38. Robinson does not argue this point or ask that we overrule *Breakiron*, and we therefore do not discuss this further in this Opinion.

dissenting)). We thus held that "a prosecution is barred when an actual conflict of interest affecting the prosecutor exists in the case; under such circumstances a defendant need not prove actual prejudice in order to require that the conflict be removed." *Id.* at 702.

Our more recent decision in *Briggs* involved a defendant's challenge to the appointment of the OAG following the district attorney's assertion of a conflict of interest that precluded his office's participation in the prosecution of the case. The district attorney requested that the OAG handle Briggs' prosecution because, of relevance here, the district attorney believed that there was a potential conflict of interest based on his close personal relationship with the murder victims (two sheriff's deputies). He was concerned that his relationship "would cloud his professional judgment and possibly interfere with his ability to make critically important legal decisions regarding the conduct of this prosecution." *Briggs*, 12 A.3d at 330-31. This Court found the district attorney's recognition of this potential conflict to be "commendabl[e]," and agreed, based on our prior holding in *Eskridge*, that "[h]is representations in the letter concerning this potential impairment were sufficient to establish a potential conflict of interest on his part sufficient to justify the attorney general's intervention under 71 P.S. § 732-205(a)(3)." *Id.* at 331.[27]

Robinson's case falls squarely within the second line of cases. As with *Eskridge* and *Briggs*, this case centers on a claim that the current DA has a personal interest in the

---

[27] Pursuant to section 205(a)(3) of the Commonwealth Attorneys Act, "The Attorney General shall have the power to prosecute in any county criminal court … [u]pon the request of a district attorney who lacks the resources to conduct an adequate investigation or the prosecution of the criminal case or matter or who represents that there is the potential for an actual or apparent conflict of interest on the part of the district attorney or his office." 71 P.S. § 732-205(a)(3), Act of Oct. 15, 1980, P.L. 950, No. 164, § 205.

outcome of Robinson's PCRA proceedings.[28] The record establishes, and Ebert admits, that Eakin is a close, personal friend. *See* Answer to Motion to Disqualify the DA's Office, 4/30/2018, at attachment (Letter from Ebert to counsel for Robinson, 3/23/2018). Ebert and other members of his office have been vocal in their support of Eakin. Ebert, Freed and Smith all sent letters in support of Eakin to the JCB and advocated against disciplinary action for his conduct. The letter signed by Ebert and other members of the Cumberland County bench acknowledged his friendship with Eakin and expressed concern about "the reputation and career of Justice Eakin." Motion to Disqualify the DA's Office, 4/16/2016, at Exhibit A. Freed's letter, written on DA letterhead, was authored during the pendency of the instant PCRA proceedings below. The letter professed Freed's "bias as … a great admirer of Justice Eakin," and described both his history with Eakin and that of other members of Freed's family. *Id.* at Exhibit C. Smith's letter referred to Eakin as his "friend, colleague, and mentor," and likewise detailed his longstanding relationship with him. *Id.* at Exhibit D.

The letters submitted by Ebert, Freed and Smith in support of Eakin also downplayed the offensiveness of the content of the emails and included their personal

---

[28] The Commonwealth's reliance upon *Harris*' focus on the procedural posture of the case (i.e., on appeal) is unavailing in this case. As discussed below, the conflict of interest in the case at bar preceded this appeal and has pervaded all aspects of these PCRA proceedings. It has touched nearly every member of the DA's office who has been involved in representing the Commonwealth in the instant PCRA matter. Moreover, because we would remand this case for further proceedings, the DA would have had greater prosecutorial discretion in the PCRA court. He would no longer simply be responding to Robinson's arguments, but would make decisions regarding what position the Commonwealth would take as to the challenges leveled by Robinson before the PCRA court, and may have chosen to advocate and present evidence (or not) in support of or against those claims.

opinions regarding a critical issue at the heart of this case, i.e., whether the emails were reflective of Eakin's bias. The letter signed by Ebert promoted the view that the emails in question merely constituted "private communications with [Eakin's] … personal friends," and though perhaps not "political[ly] correct[]," did not warrant disciplinary action against him. *Id.* at Exhibit A.[29] Freed expressed his belief that regardless of the emails, Eakin's judicial decisions included no "indication of racism, misogyny or homophobia." *Id.* at Exhibit C. Smith similarly stated his view that "there is no evidence [that his sending or receiving the offensive emails] affected his judicial temperament or influenced his judgment," and referred to the emails as "[j]uvenile and puerile, but not unethical." *Id.* at Exhibit D.

Moreover, Ebert and other members of the DA's office have received some of the emails that form the basis of Robinson's claim of Eakin's bias. It would seem incongruous for the DA to acknowledge that the emails are offensive and bigoted when he and members of his staff also received them, apparently without objection.

Based on the record before us, Ebert and other members of his staff have several "subjective reasons," outside of their "public purpose," to advocate against granting Robinson PCRA relief. *See Eskridge*, 604 A.2d at 701. Granting Robinson relief on the instant PCRA petition would result in a finding that the emails sent and received by Eakin reflected his bias against various types of crimes and classes of people. Ebert has a clear interest in advocating against such a finding to protect his own reputation, the

---

[29] As stated hereinabove, the letter Ebert and the other judges signed caused the Cumberland County President Judge to conclude that no Cumberland County Common Pleas Court judge could preside over Robinson's case because of "the appearance of a conflict of interest or impropriety." *See* Order of President Judge Guido, 1/8/2016.

reputation of his office, and that of his close friend, Eakin. These "extraneous considerations" could undoubtedly cloud Ebert's professional judgment. *See id.*

While any prosecutor may defend against Robinson's request for PCRA relief, the decision to do so must be pursuant to the law and guided by a public purpose. Prosecutorial discretion cannot be driven separately or simultaneously by the attorney's motivation to defend reputational concerns. In other words, as stated hereinabove, Robinson is entitled to a prosecutor whose judgment is neither "clouded" nor "blurred by subjective reasons." *See Eskridge*, 604 A.2d at 701; *Briggs*, 12 A.3d at 330-31.

As Ebert's personal interest in the outcome of the case could materially affect his representation of the Commonwealth in this matter, there exists a conflict of interest, and continued participation by Ebert would be improper. *See* Pa.R.P.C. 1.7(a)(2); Pa.C.J.C. Rules 1.2, 2.11(A). This conflict is not remedied by transferring the matter to another member of the DA's office; as we recognized in *Eskridge*, because the DA has a conflict of interest, the entire office is barred from handling the matter. *See Eskridge*, 604 A.2d at 701 (delegation of the case by the district attorney to another member of the office was insufficient to cure conflict as the prosecutor "remained subject to the district attorney's guidance, control, and supervision").

The OAG has the power to act as prosecutor in a county criminal matter on the request of the president judge of the county in which the case is proceeding where the OAG agrees that the case is appropriate for its intervention. 71 P.S. § 732-205(a)(5). Because there exists a conflict of interest that precludes the DA's participation in this matter, on remand, we would direct the President Judge of the Cumberland County Court of Common Pleas to request the OAG's intervention in this matter. Absent a conflict of

interest or other reason prohibiting the OAG's participation, the OAG would represent the Commonwealth in any further proceedings.

Jurisdiction relinquished.

Justice Wecht joins this opinion in support of reversal.